Filed 3/13/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| NORTH COUNTIES ENGINEERING, INC. et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> STATE FARM GENERAL INSURANCE COMPANY, <br><br>     Defendants and Respondents. | A133713 <br><br> (Sonoma County <br> Super. Ct. No. SCV243762) |

North Counties Engineering, Inc. (NCE), an engineering company, and Gary Akerstrom, its president (sometimes collectively, appellants), were sued in 2004 in two lawsuits that sought property damage arising out of the construction of a dam completed in 1999. Appellants tendered defense of the lawsuits to State Farm General Insurance Company (State Farm), under a business policy it had issued to NCE effective 1997. State Farm rejected the tender, a position it maintained for several years, until September 2007, when State Farm recognized that its position had been based on a policy declarations page first effective in 2001—and thus a policy not applicable to the claims in the lawsuits. State Farm agreed to provide a defense from September 2007 forward, leaving unreimbursed some $504,000 in expenses incurred prior to that date.

Appellants sued State Farm seeking the unreimbursed expenses for its original refusal to defend, along with other damages. Following extensive discovery, the case proceeded to a jury trial, which jury heard testimony for twenty days, never to decide any issue in the case. Rather, the trial court granted State Farm's motion for directed verdict,

1

necessarily concluding that there was absolutely no evidence supporting that State Farm had a duty to defend.  We conclude otherwise, and we reverse.

## BACKGROUND

### The Participants and the Project

NCE is a California corporation; Gary Akerstrom is its president and majority (90 percent) shareholder.  Akerstrom has a bachelor's degree in engineering and master's degrees in business administration and structural engineering.  Akerstrom also had an ownership interest in another corporation, North Counties Development, Inc. (NCD), which was co-owned and operated by his sons.  Akerstrom, who was 71 years old at the time of trial, was also a licensed real estate broker, with many property interests in the Ukiah area.

Lolonis Winery (Lolonis) owns property in Redwood Valley, Mendocino County, on which there are vineyards and reservoirs.  In 1974 Lolonis entered into a contract with NCE to design a "state-sized" earthen dam on the property (the Lolonis Dam), whose function would be to capture water from a stream referred to at trial as "Tributary A."  A state-sized dam requires government approval and oversight (Water Code § 6002 *et seq.*), and in June 1974 Lolonis submitted its plans and specifications to the State Department of Water Resources, Division of Safety of Dams for the State of California (DSOD).  DSOD approved the plans at the time, but no work was done.

Twenty years later, in 1994, Lolonis had the plans approved again.  Still, no work was begun, and in fact did not begin until 1997, with some preliminary work for the Lolonis Dam.

Meanwhile, Lolonis made improvements to two other dams on its property, the Quillen dam and the Winery dam.  The work on these other dams was done pursuant to an oral agreement Lolonis had with NCE and NCD.  Akerstrom himself was involved in the work on the Quillen and Winery dams, which included hands-on labor.  The work on these dams was completed in 1997.

2

Lolonis began clearing the site for the Lolonis Dam reservoir in 1997, and actual construction of the dam itself began in 1998. NCE and Akerstrom were involved in the labor and construction work on the dam, and all work performed through 1998, including on all three dams, was on a time and materials basis. That changed in 1999.

In 1999, Lolonis signed written agreements with NCE and NCD to complete construction of the Lolonis Dam in accordance with the plans drafted in 1974. In one contract, that of July 2, 1999, NCE and NCD were both defined as the "Contractor," responsible for furnishing "all work, labor, tools, equipment, materials . . . necessary to construct and complete in a good, expeditious, workmanlike and substantial manner the dam project under the terms of this agreement." The Contractor guaranteed "all equipment, material, supplies and work furnished on the job against defective construction, components, or workmanship," and also agreed to "indemnify and hold [Lolonis] harmless from all claims, demands, or liability arising from or encountered in prosecution or work under this contract . . . ." Further, Akerstrom guaranteed the full performance of the contracts by NCE and NCD.

In August 1999, as work progressed, NCE entered into two other agreements with Lolonis. One was to build an access road to the dam's spillway, install large drainage culverts, and work on the "south-borrow area," from which soil was taken or "borrowed" to build the dam embankment. The other was to construct a sediment basin adjacent to the south-borrow area, into which sediment present in water runoff from the borrow area was collected.[1]

Construction of the Lolonis Dam was completed in November 1999. The next month, DSOD conducted its final inspection, and in February 2000 issued a certificate of spproval, permitting Lolonis to impound water and use the dam.

---

[1] NCD had its own separate written agreement with Lolonis concerning work in the south-borrow area.

**The Insurance Policy**

Robert Mirata, a State Farm insurance agent in Ukiah, had known Akerstrom since 1987. In 1990, Akerstrom met with Mirata to obtain insurance, in Akerstrom's words to "cover [his] normal things, my business, which would cover, like fire insurance on the business, liability on the business, things that I would do outside, you know, any work like the P.C.O., products completed operations." This was important, Akerstrom said, because he has "always been doing some construction work, normally for my own account." And, he said, Mirata was aware of this: he "knew me and what I was doing."

Mirata testified that his practice was to discuss information on the application with the potential insured, along with the scope of coverage. Mirata then filled out the application for insurance, and in the box for insured-business type, wrote "engineering and surveying."

In 1991 State Farm issued policy No. 97-66-0110-2. It was entitled "Business Policy—Special Form 3," and the named insured was NCE. The declarations pages for the first many years of coverage—specifically, until the policy beginning June 11, 2000—provided as follows under the column labeled "Coverages and Limits":

"**Section I** [¶] . . . [¶]

"**Section II**

| "L | Business Liability | $1,000,000 |
| "M | Medical Payments | 5,000 |
| | "Products-Completed Operations | 2,000,000 |
| | "(PCO) Aggregate . . . | |
| | "General Aggregate (Other than PCO) | 2,000,000" |

As described in detail below, the "Products Completed Operations" (sometimes PCO) coverage became a central factor in the case.

In April 2000 State Farm sent a notice to NCE advising of State Farm's "intent to renew your policy with the Products Completed Operations Liability Exclusion Endorsement . . . as we do not offer [this coverage to] engineering companies." The endorsement was FE 6312.

4

As relevant here, the policy provided as follows:

"**SECTION II  COMPREHENSIVE BUSINESS LIABILITY**

"**COVERAGE L—BUSINESS LIABILITY**

"We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . **property damage**, . . . **injury** to which this insurance applies," going on to describe that the policy applies "to **bodily injury** or **property damage** caused by an **occurrence** which takes place in the **coverage territory** during the policy period . . . ."

The policy also had numerous "Business Liability Exclusions," one of which, the "professional services" exclusion, would also be a central factor here.  It provided as follows:

"Under Coverage L, this insurance does not apply:  [¶] . . . [¶]

"10.  . . . to **property damage** . . . due to rendering or failure to render any professional services or treatments.  This includes but is not limited to:  [¶] . . . [¶]

"b.  engineering, drafting, surveying or architectural services, including preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications;

"c.  supervisory or inspection services; . . ."

And, of course, the policy specified that State Farm had the duty to defend any claim or suit seeking damages payable under the policy.

**The Underlying Actions**

In 2000, shortly after completion of the Lolonis Dam, the State began to investigate, apparently based on complaints from neighbors of excess sediment in the creek downstream, and concerns that the construction caused erosion in the surrounding waterways.  Lolonis made attempts to remediate the problem, not to the State's satisfaction, leading to the first lawsuit involved here, that filed by the state in early 2004: *People of the State of California ex rel. California Regional Water Quality Control Board v. Lolonis Vineyards, Inc., et al.*, Mendocino County Superior Court Case SCUK CVG 03-91551 (the State action).  The State action named Lolonis (and the

5

individuals connected with it) and sought injunctive relief, civil penalties, and damages under the Water Code, the Fish & Game Code, and the Civil Code.

Lolonis filed a cross-complaint in the State action against NCE, NCD, and Akerstrom, asserting claims for breach of contract, negligence, indemnity, and declaratory relief. The complaint in the Lolonis action described for three pages the history of the planning and construction of the dam, beginning in 1974 and ending in 1999, and alleged, among other things, that in the winter of 1998-1999 the Department of Fish and Game "observed the earthen dam and determined that the unfinished construction had resulted in erosion and sediment escaping downstream."

In April 2004 Lolonis filed the second action involved here, its own action against NCE, NCD, and Akerstrom: *Lolonis Vineyards, Inc. v. North Counties Engineering Co. et al.,* Mendocino County Superior Court Case SCUK CVG 04-92182 (the Lolonis action). The Lolonis action alleged claims for breach of contract, express/implied warranty, and negligence. The complaint in the Lolonis action described for three pages the history of the planning and construction of the dam, beginning in 1974 and ending in 1999, and alleged, among other things, that in the winter of 1998-1999 the Department of Fish and Game "observed the earthen dam and determined that the unfinished construction had resulted in erosion and sediment escaping downstream."

More specifically, the Lolonis complaint alleged as follows:

"1. . . . This action is to obtain damages for breach of contract, negligence and implied warranty from a contract for the construction of a dam on the Lolonis Vineyards, Inc. property. [¶] . . . [¶]

"30. [The State] seek[s] damages for negligence in the construction of the dam resulting in harm to tributaries A and B. To the extent such damages are recoverable, such damages are the direct result of negligent construction by [appellants and NCD]. [¶] . . . [¶][2]

---

[2] The complaint in the Lolonis action attached numerous exhibits, including the State's amended complaint and the July 1999 contract.

6

"32.  [Lolonis] contends that [appellants and NCD] breached their contracts with Lolonis . . . in failing to construct the dam in a good and professional manner. Specifically, [NCE] undertook to place fill for construction of the dam, construction of roadways and construction of the spillway . . .  [S]uch fill resulted in damage to downstream tributaries . . . which has resulted in several hundred thousand dollars worth of damage to tributaries A and B."

The Lolonis complaint also alleged that the State contended that Lolonis failed to obtain proper permits for the work in Tributary B, and this was also appellants' responsibility, as they never notified Lolonis that permits were required.

For consistency with the briefing, Lolonis's cross-complaint in the State action and its complaint in its action will be referred to collectively as "the underlying actions."

**Tender of the Underlying Actions**

NCE, Akerstrom, and NCD jointly hired the Law Offices of Duncan M. James to defend them in the underlying actions.  Via a May 2004 letter, James's associate tendered defense of the underlying actions to State Farm.  The claim was numbered 05-M340-073 (the claim), and was assigned to State Farm claim representative Karla Woerner, under the supervision of team manager Jean Splinter.  Woerner designated May 7, 2004, the date the tender was received, as the "date of loss," testifying she did so for "record purposes."  There was no supporting testimony that this was an acceptable claims-handling practice, and in fact Woerner made the following entry in the claim activity log: "Put in date of loss as date received claim [May 7, 2004] for record purposes.  Will update date of loss when get a copy of the complaint for review." Despite that, State Farm never changed the date of loss.  Moreover, Woerner gave no explanation why she did not use the actual date(s) set forth in the underlying actions, which included the period beginning in 1997 and continuing through at least 1999.  As State Farm's own brief puts it, "[t]he underlying complaints tendered by appellants patently allege that the sediment and erosion damage giving rise to the suit began in the winter of 1997. . . ."  Regardless, Woerner did what she did, causing the consequences

7

that followed from what she would later testify was something she "should have updated."

According to the State Farm testimony at trial and also its claim activity log, Woerner reviewed the pleadings in the underlying actions, the attached contracts and correspondence, and spoke with James's office. In an eight-page letter dated June 9, 2004, signed by Splinter "by . . . Woerner," State Farm advised that it had "completed [its] investigation and do not believe there is a potential for coverage for the lawsuit. Therefore, we are unable to provide your client with a defense." Citing a litany of definitions and exclusions, the letter went on to assert that the negligence allegations did not arise from an "occurrence" because the "allegations against the insured cannot be construed as accidental"; that NCE's contract with Lolonis was not an "insured contract" under the policy; that Lolonis "claims their damages are a result of [NCE's] and Akerstrom's professional services," [and] thus the professional services exclusion applies; and, finally, that "Endorsement FE6312 is part of this policy" and thus PCO coverage was excluded from coverage. Interestingly, the last page of the letter advised that State Farm was "waiting for Underwriting to provide us with the Declarations page and specimen policy, which you requested. Once received, we will forward to you immediately." As will be seen, nothing was forthcoming from "Underwriting," at least for several years.

We momentarily digress from the chronology to mention Woerner's testimony at trial concerning her conduct at the time the tender was rejected, beginning with her admission that, "[w]hen [she did] the evaluation, [she] was looking at a policy for 2004." Woerner further admitted she conducted no interviews, made no inquiries, and requested no written statements regarding the underlying actions or the scope-of-work performed by appellants.

Over two years went by, apparently with no communication between James and State Farm relevant to the tender of defense. Then, on November 20, 2006, James wrote State Farm, "reasserting our demand that you tender a defense forthwith." As to what had transpired in the interim, his letter advised as follows: "Since the time of that tender,

8

my clients have been defending against the above referenced actions. [The State action] has been dismissed. Plaintiff LOLONIS VINEYARDS has been actively pursing [*sic*] the complaint in Mendocino County Superior Court . . . and, in an apparent response to an extensive 'Motion for Summary Judgment or in the Alternative Summary Adjudication' that was filed by the defendants, filed a motion to amend the complaint. [¶] By stipulation, the parties agreed: the amended complaint could be filed; . . . . A copy of the amended complaint, stipulation and order is enclosed."

This time State Farm team manager Patrick Yaklin became involved and assigned the matter to claims representative Rudy Barajas. Barajas first reviewed the matter on December 22, 2006, and as he would later testify—and the State Farm log would confirm—he fundamentally relied on Woerner's 2004 coverage memo. He did not independently establish the date of loss or reassess the claim. Rather, Barajas simply compared the new pleadings to the old by placing them side-by-side. That was it.

The State Farm claim log recites that on December 24 Yaklin "reviewed and discussed . . . with . . . Barajas," and "agree[d] with . . . Barajas analysis that there is still no duty to defend the matter and we will reiterate our denial." So, on December 28, Barajas dictated a "retender" of the Splinter letter rejecting the defense. Before he sent it, however, Barajas talked to James, who observed that Lolonis sought damages for work on the dam project that caused property damage downstream, including the failure of the sediment basin in the south-borrow area. James also recounted that the declaration pages for the applicable 1999-2000 policy contained PCO coverage; that appellants' work on the Lolonis Dam was completed in 1999; and that the alleged property damage occurred during the 1999-2000 policy period. On January 12, 2007, James sent a letter to Barajas conveying the same information, with extensive citation to California regulatory and insurance case law.

Barajas decided not to send the previously drafted retendered denial letter and reported to Yaklin. Then, by letter of January 30, 2007, State Farm referred the matter to counsel, specifically, Lawrence Guslani at Hayes Davis Bonino Ellingson McLay & Scott, LLP (Hayes Davis). Hayes Davis apparently prepared a coverage opinion, which

9

Yaklin reviewed on February 22. The next entry in the State Farm log was made by Barajas who, on March 5, "dictated retender letter." A week later Yaklin "reviewed and revised retender letter" which was "[n]ow ok to send." And by letter of March 16, Yaklin wrote to James, advising that State Farm continued in its position.

Several months later, on June 20, James wrote, once again requesting a defense. This letter again pointed out that the policy provided "PCO coverage." The letter also pointed out, in no uncertain terms, that the claimed property damage was not to the dam, but to the downstream property caused by appellants' "completed operations."

Guslani of Hayes Davis responded almost immediately, with a terse, two and a half page letter asserting that appellants "did not purchase [PCO] coverage, [the] Policy . . . includes an endorsement which excludes all . . . 'property damage' . . . included within the 'products-completed operations hazard.' "

James responded on June 22, commenting that it was "hard to give any credence to your letter when it is premised on grossly incorrect facts," going on to fax a copy of the declarations page for the 1999–2000 policy. Six days later, June 28, James sent a follow-up letter to Guslani, discussing at length the "Products Completed Operations Hazard" coverage, and again requesting a defense.

Guslani wrote to Barajas, confirming that what Guslani's firm had been provided was not complete. Thus Guslani wrote, requesting that State Farm "provide us with all of the policy information for the policies in force from June 11, 1997 to June 11, 2004. As of this time, the only policy information which we have is for the period of June 11, 2003 to June 11, 2004, which was included with your file, and the policy information for the period of June 11, 1999 to June 11, 2007."

This apparently caused Barajas to undertake a search for various underwriting information , which he apparently forwarded to Guslani on July 12.

What happened next we can only infer from the State Farm log, which indicates among other things that Guslani talked to James who, by July 16, had sent Guslani "approximately 3,000 pages of material, which . . . Guslani is reviewing." Over a month went by, with no developments at State Farm, and Barajas called Guslani on August 20.

10

On August 22, Guslani told Barajas he had received material from James and would "review and call to discuss by 8/24/07." He apparently did not, and as instructed by Yaklin, Barajas called Guslani on September 7.

James, meanwhile, heard nothing, and followed up with a detailed, 34-page letter to Guslani on September 5. Exactly what happened at State Farm from that point is not in the record, but State Farm did change its position: by letter of September 20, signed by Guslani and Benjamin Larson (another attorney at Hayes Davis), State Farm agreed that it would provide a defense from September 5, 2007 forward, and also pay James as *Cumis* counsel pursuant to Civil Code section 2860.[3] These costs were in fact paid.

In March 2010 the Lolonis action was settled at mediation, in connection with which Lolonis was paid $405,000, with contributions from appellants, NCD, and State Farm. As part of that settlement appellants and State Farm agreed "that neither party would seek reimbursement from the other for their contributions [and] . . . [i]n addition, . . . State Farm agreed that it would not seek reimbursement for any fees and costs paid or incurred to [appellants] and the Law Offices of Duncan James during the defense of the Lolonis case." The upshot of this is that the expenses incurred before September 5, 2007—$504,316.90—remained unpaid, leading to the within action.

**The Proceedings Below**

On October 17, 2008, appellants filed suit against State Farm and Hayes Davis. The complaint asserted five causes of action on behalf of both appellants: (1) declaratory relief, (2) breach of contract, (3) unfair competition, (4) fraud, and (5) breach of the covenant of good faith and fair dealing. A sixth count, for elder abuse, was alleged on behalf of Akerstrom only. Hayes Davis was named in only the third and fourth causes of action, and the firm was dismissed with prejudice on January 23, 2009. Also in January 2009 the unfair competition claim was eliminated via a demurrer sustained without leave to amend.

---

[3] *San Diego Navy Federal Credit Union v. Cumis Ins. Society, Inc.* (1984) 162 Cal.App.3d 358.

11

On April 22, 2011, a second amended complaint was filed, which was the operative pleading when the case proceeded to jury trial, beginning on July 13, 2011. Following motions in limine, testimony began on July 20 and appellants' case was presented over 18 days, until August 18.

Meanwhile, on August 17, State Farm had filed a written motion for nonsuit, and appellants their written motion for "directed verdict: breach of contract—duty to defend," motions thereafter followed by State Farm's motion for directed verdict. On August 18, following completion of appellants' case, the trial court turned to the "motions" filed by both sides. Extensive argument followed, in the course of which the court made several observations that could be considered pertinent here, including these: that there were "multiple mistakes made which . . . certainly might lead to findings of bad faith and liability"; that the "bulk" of the trial was "whether there's coverage or not. And that hasn't been decided yet, but it seems like it's a lively, true debate. It's not—it may not be black and white, but it seems like it's a legitimate, legal argument." Then, at the conclusion of that argument the court observed, without discussion or elaboration, that "the court does have to make a call on coverage, it's a legal issue," further concluding that it would defer its ruling until the presentation of State Farm's case.

State Farm's case took two days, concluding on the afternoon of August 22.

The next day the court returned to the motions, beginning with the observation that "obviously you've submitted briefs. . . . Does the plaintiff want to say something at this point." Counsel for appellants began, launching an extensive argument that would result in 72 pages of transcript. At the conclusion of that lengthy argument the court ruled for State Farm, a holding prefaced by over three pages of discussion, as follows:

"Well, seems like quite a bit of the case did touch on coverage disputes. And I do think it would have been better to handle this in a summary judgment motion in some ways. You know, obviously there may be reasons not to have done that you know.

"And we are deep into the case, ready for argument on Thursday to the jury; however, I'm not convinced that there's a possibility of coverage here. I've tried to think this through all the way through the trial, and I clearly understand that State Farm made

12

some mistakes, although we haven't gotten to the issue of fraud. I haven't seen any evidence that State Farm employees and coverage lawyers were lying and concealing and conspiring and doing something that was fraudulent. I think that's an unfair stretch of the facts.

"Obviously, they disagreed with the duty to defend even though a defense was provided for a period of time, and they have adequately fought the issues of this trial, but I don't see any evidence of criminal conduct or fraudulent conduct; obviously there was some mistakes made. Now, whether or not those mistakes were professional errors that should not have occurred that should be addressed in some manner, that could be true, but I don't think that the mistakes create coverage.

"I do agree we have to go back to the time of tender, and there are policies that favor the Plaintiff in the sense that the duty to defend is a strong policy that is broader than the duty to indemnify. If we're looking at coverage, that's to be construed broadly, if you're looking at the exclusions, that's to be looked at narrowly. If there truly was ambiguity, the benefit should go to the insured. I totally accept all of those propositions which make sense. . . .

"But, what the Court really thinks is that this case is about a professional engineer and his company, the engineering company, doing a sophisticated project, a large state dam, that has to be approved by the state that requires the skill of a very intelligent person such as Mr. Akerstrom. He was hired clearly by Lolonis Vineyards to apply his engineering expertise. His son's NCD company was really the real contracting or laboring arm of this enterprise, and the intelligence and skill and expertise was being applied by the dad.

"Clearly, I hear that he was upset when Lolonis Vineyards sued him suggesting that there was negligence in his professional activities, and it was a protracted legal fight which costs money and he didn't really have cash on hand to just pay for that; and it would have been good to have insurance coverage. But in reality, Mr. Akerstrom admits that he chose, intentionally chose, not to buy the E and O coverage. He indicated he was

going to be careful, and I assume that he does careful work, and that he normally would not create an issue that would lead to a lawsuit.

"And I'm not assuming that he was negligent in the underlying action. He did get sued and he had to defend, and that was proper and it was difficult. I also understand that he's really gotten fixated in that process as well as in the current lawsuit which has taken a while. And that's not healthy. The professionals that told us that takes a toll on your health and it affects the people you care for. And I totally understand the emotional distress story that was conveyed in court.

"However, whether State Farm made some mistakes that could arise to bad faith and relate to emotional distress damages, whether elder abuse somehow can apply to this kind of fact pattern may not be relevant if there was no coverage. It seems like you have to go back to the fundamentals as to whether the contract in this case creates the possibility of the coverage. And I think that State Farm has met its burden to show that there was no duty to defend from the get go . . . and I think that's because it's not shown to the Court to be illegal to have an insurance policy containing PCO and professional services exclusions.

"The cases that have been cited suggest there may be some fact patterns where an engineer or a like professional would be covered under PCO, at least for part of what's going on, but still some of the activities of professional services would be excluded. I don't think that that creates a conflict. I think you have to look at the specific facts before the Court and determine whether the exclusion in this case eliminated the coverage for the completed project.

"I think in fairness, the language does broadly apply here. The NCE company was a professional company giving specialized professional services and designing and building and supervising the building of a dam, and I think it is not a situation where you can say that they were sued for something incidental to their professional involvement if these contracts. [*sic*]

"You know, if there was something, the Court would agree with the Plaintiffs that maybe *Food Pro* would have applied or *Hudson* would apply, but I don't think we have

14

those fact patterns, I think we have a case where the professional company should have had coverage that would have applied to their professional activities to protect them in such a lawsuit. I don't think there's anything illegal about the contract that actually existed at the time of the occurrence.

"And just because there was a mix up and mistakes about date of loss and PCO application at the time of the occurrence doesn't in and of itself create the coverage that would apply to what NCE got sued for. So I don't believe that this set of facts shows the potential for coverage requiring a defense. And I think the burden, although it's heavy, has been met by State Farm.

"So I will rule for State Farm for all the reasons that they have advocated on the duty to defend, breach of contract issue and indicate the judgment should be ultimately given to them on that cause of action."

The next morning counsel for appellants asked the court to "reconsider its ruling yesterday and/or vacate that ruling under 663." The court agreed to hear argument, in the course of which the court made the following comments:

"[I]n fairness, if you look at the pleadings, the legal pleadings and the contracts, the NCE role is, as the engineering company, the support company, and that company was overseeing the [*sic*] NCD to make sure that whatever they did was done right. . . . NCE is the expert on the job, the professional providing professional services, design and construction, and also overseeing the work of NCD, the son's business, which is doing more of the physical activity. But in this sort of complicated project, I think that Lolonis had a right to have the expert, the engineer, oversee and guarantee that the whole thing was done right. That takes professional expertise and I think all of what Mr. Akerstrom did was professional. . . ." It was this professional work, and not "something incidental to their professional involvement" that gave rise to the underlying actions.

"[I]n this situation, it's not a malpractice or E and O policy. It's a business policy, which has good benefits, but is subject to the professional services exclusion, which was broadly stated in the policy, which then has been dealt with by cases which the Court must look to. And I think in this case, everything, whether it's in the nature of the

services that were rendered or the insured contract concept, falls under that exclusion, and the exclusion meant from the beginning that there really wasn't any basis for coverage."

With regard to appellants' argument concerning the existence of "PCO coverage," the court stated that such was "immaterial in the long run . . . because even when it's in the picture, the PCO has to be read in conjunction with the professional services exclusion." The court also noted that the professional services exclusion would be applicable to any "insured contract," and coverage could not be found on that basis. And so the court summed up:

"[B]ased on all the cases we've discussed, and the particular facts of this case, the Court concludes, again, that State Farm has met the higher burden of showing that there was no duty to defend, no conceivable basis for coverage and defense at the beginning of the—at the tender time, and that really hasn't changed. That's certainly been a consistent position of the coverage lawyers for State Farm all the way through this litigation."

State Farm submitted a six-page proposed order. On September 15 appellants filed objections to the proposed order, objections that were vigorous indeed. The objections began with the observation that the proposed order "does not represent the court's rulings or reasoning. In short, it is inaccurate, incomplete, and in some instances beyond the Court's actual findings and rulings. State Farm's effort to insert rulings not actually made and to exclude unfavorable rulings and reasoning of the Court must be rejected. The court ruled and fully explained its reasoning on the record. That—not State Farm's truncated, incomplete, and inaccurate Proposed Order—is what transpired during the subject hearings and what should ultimately be the written order of this Court." The objections continued for thirteen pages, in the course of which appellants quoted at length various comments by the court. The objections also included numerous pages of the transcript of the argument on the motion. To little avail.

The next day, September 16, the court entered its written order granting the directed verdict, signing the order prepared by State Farm's counsel with some minor deletions and one modification. Included in that order was the representation that the

16

decision was based on "the circumstances as they existed at the time of [appellants']
initial tender, including the facts reasonably available to State Farm at that time and State
Farm's evaluation of such facts." And the order concluded that "as a matter of law, the
only work at issue in the underlying actions relating to [appellants] was their performance
of professional services—including any labor or contracting work."

Judgment for State Farm was entered that same day, from which appellants filed a
timely appeal.

## DISCUSSION

### The Duty to Defend

The primary issue in the case was whether State Farm had a duty to defend, which
issue was the cornerstone of the other causes of action.[4] We thus begin with the well
settled law on the subject, as distilled, for example, in *Horace Mann Ins. Co. v. Barbara
B.* (1993) 4 Cal.4th 1076, 1081 (*Horace Mann*): "a liability insurer owes a broad duty to
defend its insured against claims that create a potential for indemnity. (*Gray v. Zurich
Insurance Co.* (1966) 65 Cal.2d 263 (*Gray*).) As we said in *Gray*, 'the carrier must
defend a suit which *potentially* seeks damages within the coverage of the policy.' (*Id.* at
p. 275, italics in original.) Implicit in this rule is the principle that the duty to defend is
broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an
action in which no damages ultimately are awarded. [Citations.] [¶] The determination
whether the insurer owes a duty to defend usually is made in the first instance by
comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to
the complaint also give rise to a duty to defend when they reveal a possibility that the
claim may be covered by the policy. (*Gray, supra,* 65 Cal.2d at p. 276.)"

A duty to defend exists whenever the lawsuit against the insured seeks damages on
any theory that, if proved, would be covered by the policy. Thus, a defense is excused
only when "the third party complaint can *by no conceivable theory raise a single issue*

---

[4] Appellants' counsel acknowledged below that this issue was dispositive of the
other claims.

17

which could bring it within the policy coverage." (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 300, some italics omitted.) In other words, "the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot.* (*Ibid.*) Thus, an insurer may have a duty to defend even when it ultimately has *no* obligation to indemnify, either because no damages are awarded in the underlying action or because the actual judgment is for damages not covered by the policy. (*Borg v. Transamerica Ins. Co.* (1996) 47 Cal.App.4th 448, 454.) If coverage depends on an unresolved dispute over a *factual* question, the very existence of that dispute would establish a possibility of coverage and thus a duty to defend. (*Horace Mann, supra,* 4 Cal.4th at p. 1085.)

Finally, any doubt "as to whether the facts give rise to a duty to defend is resolved in the insured's favor." (*Horace Mann, supra,* 4 Cal.4th at p. 1081; see generally, Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2013) §§7:520, p. 7B-10.

**The Law of Directed Verdicts, and the Standard of Review**

The law on directed verdicts remains exactly as we described it over fifty years ago, in *Shaw v. Colonial Room* (1959) 175 Cal.App.2d 845, 847–848. Reversing a directed verdict, we observed that "[t]he rule governing the granting of a directed verdict is summarized in *Estate of Lances,* 216 Cal. 397, at page 400, as follows: 'It has become the established law of this state that the power of the court to direct a verdict is absolutely the same as the power of the court to grant a nonsuit. A nonsuit or a directed verdict may be granted "only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given." ' [Citations]" (Accord, *Elmore v. American Motors Corp.* (1969) 70 Cal.2d 578, 583 [nonsuit]; *Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291.)

18

Addressing the law in the setting of a nonsuit, the Supreme Court has observed that, because granting the motion removes the case from the jury, "courts traditionally have taken a very restrictive view of the circumstances under which" a nonsuit is proper. (*Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 117–118.) Later elaborating on the point, the court said those "very restrictive" circumstances are only where "interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of plaintiff a judgment for the defendant is required as a matter of law." (*Carson v. Facilities Develop. Co.* (1984) 36 Cal. 3d 830, 839.) Conflicting evidence must be disregarded, including evidence brought out on cross-examination of plaintiff's witnesses (*Miller v. Los Angeles County Flood Control Dist.* (1973) 8 Cal.3d 689, 700, fn. 10), and the trial court may not weigh the evidence. (*Campbell v. General Motors Corp., supra,* 32 Cal.3d 118.)

On appeal, we decide de novo "whether sufficient evidence was presented to withstand a directed verdict. [Citation.] In that sense, we stand in the shoes of the trial court." (*Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 46–47.) And we will reverse if there was substantial evidence tending to prove appellants' case and the state of the law supports the claim. (*Margolin v. Shemaria* (2000) 85 Cal.App.4th 891, 895; see *Woods v. Union Pac. R.R. Co.* (2008) 162 Cal.App.4th 571, 576.)

The issue, therefore, is whether there was evidence that would support that State Farm had a duty to defend. We conclude there was. Before turning to a discussion of that evidence, some observations about the trial court's approach are appropriate.

**The Trial Court's Approach to the Motions Was Erroneous**

We set forth above the applicable law governing State Farm's motion before the court. We also set forth the trial court's comments at the end of the lengthy argument, immediately prior to its holding for State Farm. In the course of the argument leading to that conclusion, however, the court made several comments and observations indicating that it was not, as the law requires, looking to determine whether there was any evidence that might support a conclusion that there was a duty to defend, but rather looking only

19

for evidence—indeed, even inferences from evidence—that there was not. A few illustrations should suffice.

At one point counsel for appellants was arguing that the professional services exclusion "can't wipe out PCO altogether," going on to urge that we "take a step back" to Akerstrom's testimony and to the complaint, where "Lolonis was seeking [damages] as a result of the discharge of sediment into downstream property and to the waters of the State of California. We've heard not contradicted testimony that the majority of that cause, the cause of the sediment was the failure of the sediment basin. Who built the sediment basin? Mr. Akerstrom did. . . ." The court interrupted: "How can you say that the building of that basin did not require his skill and professional background similar to *Stone*? And I would say most people would not know how to properly go out there and build that basin."

At another point counsel for appellants answered that "all we're asking the court to do [is] look at the nature of the facts here. It's construction activity . . . ." Again the court interrupted: "But if there was construction activity in fairness to the facts of this case, *most* of this is being done by NCD not NCE. NCE is there to be the more sophisticated contractor who has the engineering background to satisfy the state dam project and oversee the whole thing to completion. . . ." (Italics added.)

When counsel for State Farm was attempting to downplay Akerstrom's role in any construction, that "this isn't some random digging of a ditch, this is—," this time the court interrupted with this: "Sounds like it takes expertise."

Later, counsel for State Farm focused on the fact that Akerstrom had not purchased errors and omissions coverage, even after the PCO coverage was eliminated by the endorsement in 2000. This colloquy ensued:

"THE COURT: And he didn't go out at that same time and buy malpractice insurance?

"MR. HOLLAND [counsel for State Farm]: Of course not. Never did.

"MR. MCMULLEN [counsel for appellants]: How is that possibly relevant? He had PCO coverage, that's the only point we're talking about. . . .

20

"THE COURT:  Well, we're talking about the reasonable expectation of the coverage.

"MR. MCMULLEN:  Not in 2004.  In 1999.  You asked him a question about what he did three years later.  It is completely  irrelevant.

"THE COURT:  It might be circumstantial evidence as to state of mind."

In sum, these and other comments indicated that the court was looking at the evidence with the view that all that was involved was appellants' "expertise," and that they apparently should have had errors and omissions coverage.  Whatever expertise appellants had is one thing.  What Lolonis *alleged* against appellants is another.

Finally, we note the court's comment in the course of its holding that what this case was "about" was "a professional engineer . . . doing a sophisticated project . . . that requires the skill of a very intelligent person such as Mr. Akerstrom. . . ."  While we may not agree with such description, we must ask how can a court determine what a case is "about" until it hears the case.  And until it hears the case, the evidence is unknown.  As many cases have held, "[i]f coverage depends on an unresolved dispute over a factual question, the very existence of that dispute would establish a possibility of coverage and thus a duty to defend."  (*Mirpad, LLC v. California Ins. Guarantee Assn.* (2005) 132 Cal.App.4th 1058, 1068; accord *Horace Mann, supra,* 4 Cal.4th at p. 1085; *Howard v. American National Fire Ins. Co.* (2010) 187 Cal.App.4th 498, 520.)

The law requires a trial court in ruling on State Farm's motion here to look for any evidence that might support appellants, and draw all inferences in their favor.  The court here acted 180 degrees contrary.  And reached the wrong conclusion.  There was evidence supporting State Farm's duty to defend.

**There Was Substantial Evidence Supporting a Duty to Defend**

We begin with the testimony of State Farm's own claims personnel, three of whom admitted that the pertinent policy information—that is, the declarations pages in existence before 2000—demonstrated a duty to defend.  Illustrative is the testimony of Barajas, who admitted that the analysis of the proper policy had triggered a duty to defend:

21

"QUESTION: As we sit here today, the fact that the 1999 policy through 2000 in fact contained coverage for products and completed operations, do you believe that affected whether or not there was a duty to defend NCE in the underlying lawsuit?

"ANSWER: As of this date, yes.

"QUESTION: Okay. And why is that?

"ANSWER: . . . [T]here was additional information provided . . . well, I became aware of the information provided of the work that was done prior to 2000, the potential property damage, the—you know, non-supervisory engineering, so as a result of that information, then, yes, today I would say that that would have triggered a duty to defend.

"QUESTION: Again . . . we're talking about today, that would have triggered a duty to defend, did you have the same opinion at the time you referred it on to Mr. Yaklin suggesting that maybe this needed to be looked at again because it had been previously denied?

"ANSWER: Correct. . . .

"QUESTION: Right. Because there was potential for coverage?

"ANSWER: Correct."

Team Manager Splinter, who (via Woerner) signed the original letter rejecting a defense, testified that the scope of allegations against appellants in the underlying action included "damage . . . in 1999-2000." Splinter was later asked whether there was a "potential" for coverage if the property damage occurred during the 1998-1999 policy period. This was her answer:

"ANSWER: Yes, I would say that.

"QUESTION: And in 1999 to 2000, there is a potential for coverage?

"ANSWER: Yes, under PCO, under that, yeah."

Yaklin, too, was asked about all this, and admitted that many allegations in Lolonis's complaint specified that construction work—not engineering or supervisory services—caused the alleged downstream-property damage. And, assuming the underlying actions sought recovery for property damage, which they did, it created "a potential of coverage."

22

*Wickoff v. James* (1958) 159 Cal.App.2d 664 was a medical malpractice case by a husband and wife, based on a procedure on the wife done by Dr. James. The trial court granted a nonsuit. The Court of Appeal reversed, based on the husband's testimony that immediately after the operation, Dr. James said, "Boy, I sure made a mess out of things today, didn't I." The court held such admission was sufficient to give rise to inference of negligence. (*Id.* at pp. 667-668.) The numerous admissions here—admissions not even mentioned, let alone discussed, by State Farm—are a fortiori.[5]

There was much more evidence that supported a possible duty to defend, including the fact that once the proper declarations page was located and reviewed, State Farm agreed to defend. While we agree with State Farm that in general a decision by an insurer to defend under a reservation of rights cannot by itself be used to support a duty to defend, here it can. This was Yaklin's entry on September 11, 2007: "TM and CR Barajas spoke with attorneys Guslani and Larson at 3:30 yesterday. We reviewed the new information contained in attorney James 9/5/2007 letter, in particular the information on page 12. This information appears to create a duty to defend under the policies which

---

[5] We are aware of cases stating that opinion evidence is irrelevant to interpret an insurance policy, and thus the insurer's employees cannot create coverage by an admission. (See, e.g. *Chatton v. National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 846, 865 (*Chatton*); see generally, Croskey, Cal. Practice Guide, *supra*, § 4:55, p. 4-11.) This case, of course, is about the duty to defend.

One case might be read to hold that a duty to defend cannot be based on admissions. That case is *Quan v. Truck Ins. Exchange* (1998) 67 Cal.App.4th 583, 601 (*Quan*), where the court described "various memoranda" in the claim file that "reflect lower-echelon insurer employee opinions that there may be or was an obligation to defend." (*Id.* at p. 594.) The court later concluded, without discussion or elaboration, that "the insureds' argument that insurance company employee opinions or memos give rise to a duty to defend . . . must fail," citing in claimed support *Chatton* and *Devin v. United Services Auto Assn.* (1992) 6 Cal.App.4th 1149, 1159, fn. 5. (*Quan, supra,* 67 Cal.App.4th at p. 601.) *Chatton* dealt with coverage, not a duty to defend. And *Devin* dealt with evidence from an expert witness, not insurance company employees. In any event, the employees here were not "lower echelon," but in fact the employees charged with the decision, and thus *Quan* is distinguishable. And if it is not, we would decline to follow it.

23

did not have the Products Completed Operations Exclusion endorsement FE-8312. (From 1997 to 2000?)"

Similarly supportive is an October 12, 2007 entry on the State Farm claim log, described as a "Court Task Assignment." That entry states that the "DTD [Duty to Defend] unit *found* a duty to defend on 9/24/07." (Italics added.)

On top of all that are the allegations in the Lolonis action itself, which included allegations about—indeed, focused on—appellants' (and NCD's) work in *constructing* specific elements of the Lolonis dam, including placement of fill, constructing roadways and the spillway, and finish work. As State Farm's Barajas acknowledged, the Lolonis complaint included allegations of "nonsupervisory engineering." Yaklin himself testified in terms of the "construction work."

**State Farm's Arguments Are Not Persuasive**

State Farm asserts two arguments in support of its position that there was no possibility of coverage, and thus no duty to defend. The first argument is that the professional services exclusion precluded coverage. The second is that the policy is not "rendered ambiguous by the products completed-operations limit," an argument that proceeds on the fundamental premise that PCO does not provide "coverage." In State Farm's words, "Nowhere does the Policy or its declarations pages express a separate grant of coverage for a PCO-type risk. . . ." As State Farm puts it at another point, products completed operations is not described as a "separate item of coverage."

**PCO and Its Application Here**

Taking up State Farm's second argument first, we begin with several observations.

First, PCO is, as noted, in the column titled "Coverages and Limits."

Second, Stephen White, the senior underwriter at State Farm, testified that "[w]e should not have issued a policy with product and completed operations coverage."

Third, State Farm's letter of April 7, 2000, stating that the exclusionary endorsement would be added to the policy beginning with the June 2000 policy advised "of this Company's intent to renew your policy with the Products-Completed Operations Liability Exclusion endorsement (FE 6312) as we do not offer this *coverage* on

24

engineering companies." (Italics added.) In short, State Farm itself described PCO as "coverage."

But whatever its description, the fact is that PCO was referred to on the pertinent declarations page(s) as protection offered under the policy, with its own separate limits of $2,000,000. This protection was defined as follows:

"13. **products-completed operations hazard**:

"a. includes all . . . **property damage** arising out of **your product** or **your work** except products that are still in your physical possession or work that has not yet been completed or abandoned. The . . . **property damage** must occur away from premises you own or rent.

"**Your work** will be deemed completed at the earlier of the following times:

"(1) when all of the work called for in your contract has been completed;

"Your work" was defined as "work or operations performed by you or on your behalf; and materials, parts or equipment furnished in connection with such work or operations," and including warranties or representations or providing/failing to provide warnings or instructions with respect to such work and materials.

As described above, construction of the Lolonis Dam was completed in November 1999. The state issued its certificate of approval in February 2000. Within months the basin failed and a large amount of sediment was discharged onto lands of downstream-property owners and state waters, causing the alleged property damage. The pleadings in the underlying actions included allegations that appellants' *completed* work caused damage, damage allegedly caused by construction work and labor. Those pleadings also included a claimed failure to provide instructions for permits. This was within the definition of "your work."

Courts have noted that even apparently clear policy language may be ambiguous when read in the context of the policy and the circumstances of the case. (*American Alternative Ins. Corp. v. Superior Court* (2006) 135 Cal.App.4th 1239, 1246.) Whether the PCO coverage rendered the policy ambiguous, as appellants contend, or not, as State Farm contends, it certainly complicated the situation, as have similar policy provisions.

25

Almost fifty years ago, our Supreme Court decided *Insurance Co. of North America v. Electronic Purification Co.* (1967) 67 Cal.2d 679, affirming a declaratory relief judgment that the insurance company had a duty to defend its insured in a wrongful death action.  There, in a setting involving products hazard coverage, an exasperated court noted as follows:

"When confronted with products hazard clauses, many courts, troubled by the difficulty of ascertaining their meaning, have warned against interpreting them to deny the basic insurance contemplated by the insured.  'In summary, the plaintiff gave the defendant coverage in a single, simple sentence easily understood by the common man in the market place.  It attempted to take away a portion of this same coverage in paragraphs and language which even a lawyer, be he from Philadelphia or Bungy, would find it difficult to comprehend.' [Citation.] 'The true meaning of the policy is difficult to determine.  An examination of it involves a physical effort of no mean proportions. . . .  If [the reader] is possessed of reasonable physical dexterity, coupled with average mental capacity, he may then attempt to integrate and harmonize the dubious meanings to be found in this not inconsiderable package.  A confused attempt to set forth an insuring agreement is later assailed by such a bewildering array of exclusions, definitions and conditions, that the result is confounding . . .'  [Citations.]" (*Insurance Co. of North America v. Electronic Purification Co., supra,* 67 Cal.2d at pp.689-690.)

State Farm never meaningfully discusses what PCO does in fact cover or provide.  Its position on this is, as noted, that PCO was not a "coverage", that the policy was not ambiguous, and that appellants had no reasonable expectation of coverage.  State Farm's position is grounded on the professional services exclusion.

**The Professional Services Exclusion Does Not Preclude the Potential for Coverage**

State Farm's first, and fundamental argument is that the "Professional Services exclusion precluded coverage," an argument it begins this way: "Consequently, the issue of whether a defense duty existed can be distilled to a single, simple question: did the damages alleged in the Underlying Actions arise solely from the performance of professional services?" The argument proceeds as follows: a professional service is any task requiring skill performed for payment; the underlying actions sought only damages for performance of professional services; and the exclusion includes any manual work because such work was performed while appellants were acting as professionals. In the course of its argument State Farm discusses several cases that have found no duty to defend, and its argument then concludes with this:

"The fatal flaw in appellants' analysis is their insistence that State Farm, and this Court, ignore the greater factual and legal context governing their claims. They have cherry-picked certain aspects of Akerstrom's work, and excerpts from the relevant contracts, underlying complaints, insurance policy, and case law. Appellants have presented these hodgepodge pieces to the Court, as a collage in aid of coverage. [¶] However, this is not the proper method for evaluating a liability carrier's duty to defend. Insurance does not exist in a vacuum. The availability of liability benefits is scrutinized in light of the insurance contract as a whole, the allegations of the underlying complaints in their entirety, the universe of facts as they existed at the time of tender, and 'common sense.' (*Bank of the West v. Superior Court (Industrial Indemnity Co.)* (1992) 2 Cal.4th 1254, 1276 (*Bank of the West*); [*State Farm Gen. Ins. Co. v.*] *Frake* [(2011)] 197 Cal.App.4th [568] at p. 578.)" That, State Farm asserts, is the "rubric" for analysis.

Neither case supports any such "rubric." Neither states that the allegations in the underlying complaints must be looked at in "their entirety." And while *Bank of the West*

27

uses the term "common sense," it is not in any way helpful to State Farm here.[6] The "professional services" exclusion is not the panacea State Farm would have it, certainly not when analyzed under the appropriate standard: " 'narrowly against the insurer.' " (*Reserve Ins. Co. v. Pisciotta* (1982) 30 Cal.3d 800, 808.)

To begin with, it might be argued that the "professional services" exclusion cannot possibly apply. As quoted above, the professional services exclusion is set forth in the policy as follows: "Business Liability Exclusions. [¶] Under Coverage L, this insurance does not apply: . . . 10. to bodily injury, property damage or personal injury due to rendering or failure to render any professional services or treatments." As also quoted above, PCO is listed on the declarations page separately from Coverage L, specifically two lines later, after coverage M, and with its own limits of coverage.

In any event, there was evidence that not all that was alleged, or later proven at trial, was within the exclusion here, which provided that the policy does not apply "to . . . property damage . . . due to rendering or failure to render any professional services or treatments. This includes but is not limited to: [¶] . . . [¶] "b. engineering, drafting, surveying or architectural services, including preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; [¶] c. supervisory or inspection services."

There were many allegations, and much evidence, without the language of the exclusion, including that damages were sought for "negligence in the construction of the dam," and as the "direct result of negligent construction by [appellants and NCD]." The Lolonis action included allegations of work in constructing specific elements of the Lolonis dam, including placement of fill, constructing roadways and the spillway, and finish work. And the evidence showed that NCE and NCD performed some ordinary

---

[6] Analyzing the term "advertising injury" in a comprehensive general liability policy, the Supreme Court observed, "We believe that the apparent majority rule, under which 'advertising injury' must have a causal connection with 'advertising activities,' best articulates the insured's objectively reasonable expectations about the scope of coverage. This conclusion is partly a matter of interpretation and partly a matter of common sense." (*Bank of the West*, *supra,* 2 Cal.4th at p. 1276.)

28

labor and construction work in connection with the building of the dam. Indeed, State Farm's Barajas acknowledged that the complaint included allegations of "nonsupervisory engineering." And Yaklin testified in terms of the "construction work." This was not within the policy definition of professional services.

That there was evidence of something other than professional services was acknowledged by State Farm's counsel below. For example, in the course of the argument on the motions, counsel for State Farm mused: "[D]id [Akerstrom] do once in a while installation? Yes." Along those same lines, in the subsequent argument seeking reconsideration, counsel for appellants stated that the underlying action "was not limited to suing Mr. Akerstrom for his professional services, but for every ounce of work done. . . . He's being sued for the construction work. He's being sued for everything NCD did. He's being sued for that, too." Counsel for State Farm responded: "I don't disagree with that, your Honor." Indeed, the trial court itself acknowledged as much, commenting that if "there was construction activity in fairness to the facts of this case, *most* of [it] is being done by NCD not NCE." (Italics added.) Maybe so. Maybe not. But the fact that *any* of it was being done by an insured is enough.

Ignoring all that, State Farm blissfully puts it this way: "The professional services exclusion is a standard part of CGL policies. It bars from coverage damages related to the 'rendering or failure to render any professional services or treatments.' This provision has been regularly applied by California courts to exclude coverage in an array of circumstances. See e.g. *Amex Assurance Co. v. Allstate Ins. Co.* (2003) 112 Cal.App.4th 1246; *Tradewinds Escrow, Inc. v. Truck Insurance Exchange* (2002) 97 Cal.App.4th 704 (*Tradewinds*); *Ray v. Valley Forge Insurance Co.* (1999) 77 Cal.App.4th 1039 (*Ray*); *Hollingsworth v. Commercial Union Insurance Co.* (1989) 208 Cal.App.3d 800 (*Hollingsworth*); and *Stone v. Hartford Co.* (C.D. Cal. 2006) 470 F.Supp.2d 1088 (*Stone*)." These cases do not support State Farm here, for several reasons.

First, none of the five cases cited by State Farm involved PCO coverage, and the complications, if not outright ambiguity, presented by it.

29

Second, two of the cases, *Amex* and *Stone*, involved homeowners policies. This was a "Business Liability" policy.

Third, in at least three of the cases, *Amex*, *Hollingsworth*, and *Stone*, "professional services" was not defined. Here, the term was defined, a definition that did not include "construction" or "labor" or some of the other things appellants were accused of in causing the damage. The exclusion must be narrowly construed. So construed, it did not undisputedly apply here.

State Farm relies heavily on *Hollingsworth, supra,* 208 Cal.App.3d 800, a case it cites more than 10 times. To no avail. There, the insurer had issued a "Merchants Package Policy" covering a cosmetics business. A customer sued, claiming she was injured while having her ears pierced. The Court of Appeal affirmed a summary judgment for the insurer based on the professional services exclusion. (*Id.* at pp. 808, 811.) State Farm asserts that, "as exemplified by *Hollingsworth*, the professional services exclusion applies to almost any purposeful activity done in furtherance of the insured's business." We do not read the exclusion so broadly. In any event, *Hollingsworth* is distinguishable.

To begin with, the customer in *Hollingsworth* suffered her injury while she was having her ears pierced, that is, during the rendering of the professional service.[7] And the court found that in the context of the cosmetics business, ear piercing is part of a cosmetician's "technical" work, "constitut[ing] an aspect of the . . . profession," and that

_____

[7] *Tradewinds*, another case cited many times in State Farm's brief, states that "courts have held numerous circumstances fall within the exclusion for professional services . . . , with the unifying factor being whether the injury occurred during the performance of the professional services, not the instrumentality of injury. (*Antles v. Aetna Casualty & Surety Co.* (1963) 221 Cal.App.2d 438, 443 [chiropractic patient burned by defective heat lamp not covered by CGL policy because it occurred during rendering of professional services] see also *Hollingsworth v. Commercial Union Ins. Co., supra,* 208 Cal.App.3d at p. 810.)" (*Tradewinds, supra,* 97 Cal.App.4th at p. 713.) In other words, the "unifying factor" is that the exclusion applies to damage occurring during the performance of the professional work and resulting from the professional work.

30

"[t]he injury resulting from the faulty ear piercing occurred while [the insured] was operating a retail cosmetics store." (*Id.* at pp. 807–808.) Here, by contrast, the alleged damage occurred after appellants' work was completed, and based on work outside the scope of that typically performed.

*Food Pro International Inc. v. Farmer's Ins. Exchange* (2008) 169 Cal.App.4th 976 (*Food Pro*) is persuasive. Food Pro, the insured, was an engineering consulting firm in the food industry which was hired by a fruit processor (Mariani) to assist it in relocating its operations. (*Id.* at p. 979.) After an electrical contractor at Mariani's plant had disconnected a piece of machinery, another contractor removed it, which removal left a large hole in the floor. Aamold, an employee of Food Pro on the scene, recognized the danger and advised Mariani's employees about it. (*Id.* at p. 980.) Sometime later, Aamold was on the scene talking to a foreman when Roy Pettigrew, an employee of the electrical contractor, fell through the hole and was injured. Pettigrew and a workers' compensation insurer sued Food Pro, which tendered the actions to Farmers, which refused to defend based on the professional services exclusion. Ultimately, judgments totaling over $1,736,000 were entered against Food Pro. These were also tendered to Farmers, which denied them. (*Id.* at pp. 982–983.)

Food Pro sued, and Farmers moved for summary judgment that it had no duty to defend. The motion was denied, the trial court concluding that Farmers had not met its burden to demonstrate that it had no duty to defend. (*Food Pro, supra.* 169 Cal.App.4th at p. 983.) The opinion then described what happened next: "One month later, the duty to defend issue was again presented to the trial court in the form of a court trial. The parties made available the same evidence relied on in the summary judgment motion and presented a joint exhibit list for review. On December 4, 2006, the trial court issued its statement of decision. The court found that Food Pro 'easily established a prima facie case for coverage and a duty to defend by introducing the CGL policy and third party complaints filed against it in the underlying action.' The court concluded '[a]s a matter of law,' however, 'that the undisputed extrinsic evidence known to Farmers at the time of tender, and relied upon by Farmers to deny coverage, conclusively negates coverage and

31

establishes that the only reasonable conclusion possible is that the injury to Mr. Pettigrew "arose out of the rendering or failure to render professional services by or for" FoodPro's employee, Mr. Aamold, "including supervisory, inspection or engineering services." ' The court found specifically that Food Pro was responsible for 'issuing all instructions to contractors' and 'coordinating all contractor activities' on site and that Aamold's log notes undisputedly established that he directed Pettigrew and the Walther Electric crew to work in the area of the hole on the morning of the incident. The court thus concluded that the 'undisputed evidence establishes that the bodily injury suffered by Pettigrew arose out of FoodPro's rendering of supervisory services, which is excluded under Endorsement CG22431185.' " (*Id*. at p. 984.)

Food Pro appealed, its fundamental position arguing that "Farmers and the trial court mischaracterize[d] the extrinsic evidence as undisputed and appl[ied] the professional services exclusion so broadly that the exception swallows the rule." (*Food Pro, supra,* 169 Cal.App.4th at p. 986.) The Court of Appeal agreed.

The court began with the observation that "[P]rofessional services, broadly defined, involve ' " 'specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual.' " ' (*Tradewinds, supra,* 97 Cal.App.4th 704, 713.)" (*Food Pro, supra,* 169 Cal.App.4th at p. 986.) The court then turned to the trial court's "summation of the 'undisputed' evidence," which the court described—a description that could be made here—as being accepted by the trial court without recognizing "any alternative theories or contradictory evidence." (*Ibid.*) The court then discussed various pieces of evidence that were in fact disputed (*id.* at pp. 987–988)—and thus supported a duty to defend.

The court also referred to Pettigrew's complaint, and observed that it "does not allege, for instance, that the injury was related to Food Pro's designs or specifications for the relocation and installation of Mariani's processing operations, or to other engineering work. . . . The facts available to Farmers at the time it denied a duty to defend thus show potential liability arising from the breach of a common law duty, and not from the performance of professional services. Faced with the disputed facts revealing a

32

possibility the claim was covered, [and] . . . . [a]bsent a trial to resolve the genuine factual dispute, Farmers could not conclusively negate the potential for coverage and, therefore, had a duty to defend Food Pro. [Citations.]" (*Food Pro, supra,* 169 Cal.App.4th at p. 989.)

The court then distinguished the cases relied on by Farmers, essentially the same cases cited by State Farm here, and summed up: "Aamold's involvement in the Pettigrew incident arose from his presence at the site, but the injury did not 'aris[e] out of the rendering or failure to render any professional services.' The Pettigrew and Explorer actions therefore raised the potential for coverage under the CGL policy, and Farmers had a duty to defend." (*Food Pro, supra,* 169 Cal.App.4th at p. 991.) This conclusion, the court noted, was "consistent with the requirement that the court construe policy exclusions narrowly." (*Id.* at p. 992.) The *Food Pro* analysis is fully applicable here.

Finally, there is an additional basis for finding the professional services exclusion inapplicable here. As quoted above, the PCO definition covered the insured's "work" and its "product," terms in turn defined to specifically include "the providing of, or failure to provide warnings and instructions." Here, the Lolonis complaint alleged that "Akerstrom never notified Lolonis . . . that additional permits were required" for the dam project, which resulted in damages. [8]

We end the discussion on the professional services exclusion by observing that none of the cases mentioned above involve such exclusion in the context of a policy that also has PCO coverage. As we noted, none of the six cases relied on by State Farm had such coverage. And neither did *Food-Pro*. A few cases cited by the parties do involve the interplay between PCO coverage and the professional services exclusion, one of which further supports our conclusion here: *S.T. Hudson Engineers, Inc. v. Pennsylvania Nat. Mut. Cas. Co.* (2006) 388 N.J. Super. 592 [909 A.2d 1156]. The case arose out of the collapse of a pier that resulted in three deaths, numerous injuries, and significant

---

[8] In light of this conclusion, we need not reach appellants' contention that there was a duty to defend under the "insured contract" provision.

property damage. Hudson Engineers (Hudson) had been involved with the pier over the years, and was among many defendants named in various suits arising out of the collapse. (*Id.* at p. 1159.) Hudson tendered defense to its insurer, Penn National, which refused it, based on the professional services exclusion. Early on, the trial court denied Penn National's motion for summary judgment, finding material issues of fact whether the actions came within the professional services exclusion. Later, when the underlying actions settled, Hudson moved for "pretrial determination of the legal issues," and the trial court found there were "allegations in the underlying complaints that fell outside the ambit of professional services," and thus Penn National owed a defense. (*Id.* at p. 1160.) Penn National appealed and, like State Farm here, contended that all the allegations in the underlying actions came within the exclusion for professional services. (*Id.* at pp. 1162-1163.) The appellate court rejected that contention, in a holding we find persuasive. It was as follows:

"Penn National asserts that the professional services exclusion limiting coverage to personal injury or property damage 'arising out of the rendering of or failure to render any professional services by you or . . . on your behalf' should be construed broadly to include any property damage or personal injury ' "originating from," "growing out of," or "having a substantial nexus" with' the professional activity of its insureds. We disagree. Our trial courts have been 'directed to take a broad and liberal view so that the policy is construed in favor of the insured.' [Citations.] The more inclusive use of the phrase 'arise out of,' urged by Penn National, has been to provide coverage, not limit it. [Citations.]

"Penn National also argues that its products-completed operations coverage is subject to the professional services exclusion and thus any injuries arising out of the engineer's failure to warn fall within that exclusion. Again, we disagree. Penn National's professional services liability exclusions define professional services as including '[t]he preparing, approving, or failing to prepare or approve' maps, drawings, opinions, reports, surveys, field orders, change orders, designs or specifications, and supervisory, inspection, architectural or engineering services and activities. The

exclusions speak in terms of the various professional services actually performed or conducted.

"By contrast, the products-completed operations coverage, for the failure to provide warnings, does not emanate from the performance or failure to perform actual professional services, but from the giving or failure to provide information. The nature of the act or omission in each is different. It is the nature of the act or omission, not the nature of the resulting damage that is determinative of coverage. [Citations.] The excluded acts in the CGL policy are the actual professional services, whereas the acts that fall within products-completed operations coverage relate to the giving of information, i.e., instructions and warnings, albeit, resulting from either the performance or non-performance of the contracted-for professional services. Moreover, the Agricultural policy's expressed reference to the inclusion of completed operations coverage in the CGL shows that the two were intended to complement each other. To come to a different conclusion would frustrate the reasonable expectations of the insured. Thus, we conclude that liability for property damage and personal injury resulting from the failure to warn or give instructions was not excluded by the professional services exclusion in the CGL policy." (*S.T. Hudson Engineers, Inc. v. Pennsylvania Nat. Mut. Cas. Co., supra,* 90 A.2d at pp. 1163–1164.)

State Farm cites two cases on this point: *Ray, supra,* 77 Cal.App.4th 1039 and *American Economy Ins. Co. v. Schoolcraft* (D. Colo. 2007) 551 F.Supp.2d 1235. Neither is helpful.

Ray was a roofing consultant who was sued by a homeowner's association for giving bad advice concerning roofing materials. (*Ray, supra,* 77 Cal.App.4th at p. 1039.) His insurer refused to defend, and he sued. The trial court granted summary judgment for the insurer, and the Court of Appeal affirmed, concluding first, and fundamentally, that there was no "occurrence," as the association's complaint alleged that Ray "acted deliberately as a professional consultant hired to provide advice." (*Id.* at p. 1046.)

As to Ray's argument that the PCO language required the insurer to defend, the Court of Appeal disagreed. But not on any basis supporting State Farm here. Rather, it

35

was based on a notice "summarizing changes" to the policy, limiting what was within PCO. (*Ray, supra,* 77 Cal.App.4th at p. 1046.) As the court described the issue: "The reference in the notice to products and completed operations language in the policy states only that 'Products and Completed Operations Coverage Provisions have been revised to clarify original coverage intent to provide coverage *for failure to adequately warn* under the 'products/completed operations hazard.' . . ." (*Id.* at p. 1047.) And the association did not allege that Ray failed to warn or should have warned of risks associated with the shingles he recommended. Finally, the term "your work" was only contained in the exclusions to coverage. (*Ibid*.) Here, the PCO coverage is not restricted by any revision, and appellants are not straining to find PCO coverage by invoking an exclusion.

*American Economy Ins. Co. v. Schoolcraft, supra,* 551 F.Supp.2d 1235, a case State Farm describes as one where the district court judge "soundly rejected the same arguments made by appellants here," is likewise distinguishable. The facts there involved a doctor who was sued for implanting a defective embryo. The district court held there was no duty to defend. The reason was that Colorado law specifically provided that implantation of an embryo was not a sale of a good or a product, but rather the provision of a medical service. Colorado law also provided that a doctor could not be liable for injuries arising from genetic counseling and screening unless the damage could have been prevented or avoided by ordinary standard of care of the physician or other health care professional. In short, the implanting of a defective embryo could not be considered a completed "product" for PCO coverage, but was by statute a professional medical service to which the professional services exclusion necessarily applied. (*Id.* at pp. 1242-1244.)

## DISPOSITION

The judgment is reversed and the matter remanded to the trial court. As counsel for State Farm conceded at oral argument, this reversal necessitates that on remand judgment be entered determining that State Farm had a duty to defend.

_____
Richman, J.

We concur:


_____
Haerle, Acting P.J.


_____
Brick, J.[*]


A133713, *North Counties Engineering, Inc. v. State Farm Ins. Co.*

_____

[*] Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:                             Sonoma County Superior Court

Trial Judge:                             Honorable Mark L. Tansil

Attorney for Plaintiffs and Appellants:  Law Office of Duncan M. James, Duncan
                                         M. James, Donald J. McMullen

Attorneys for Defendant and Respondent:  LHB Pacific Law Partners, Clarke Holland,
                                         Brendan J. Fogarty, Jenny J. Chu