909 A.2d 1156 (2006)
388 N.J. Super. 592
S.T. HUDSON ENGINEERS, INC., Hudson Construction Consultants, Inc., Samuel T. Hudson, Robert S. Hudson, and Al Stoner, Plaintiffs-Respondents,
v.
PENNSYLVANIA NATIONAL MUTUAL CASUALTY COMPANY, Defendant-Appellant, and
Agricultural Insurance Company, Defendant.
Superior Court of New Jersey, Appellate Division.
Argued October 10, 2006.
Decided November 16, 2006.
*1159 Kenneth M. Portner, Philadelphia, PA, argued the cause for appellant (Weber Gallagher Simpson Stapleton Fires & Newby, attorneys; Mr. Portner and Michael S. Savett, on the brief).
Stacy Alison Fols argued the cause for respondents (Montgomery, McCracken, Walker & Rhoads, attorneys; Ms. Fols, John J. Levy, Amelia Carolla, Cherry Hill, and Alfred J. Kuffler, Philadelphia, PA, of the Pennsylvania bar, admitted pro hac vice, on the brief).
Before Judges LINTNER, SELTZER and C.L. MINIMAN.
The opinion of the court was delivered by
LINTNER, J.A.D.
On May 18, 2000, Pier 34, located on the western shore of the Delaware River in Philadelphia, collapsed into the river causing three deaths and numerous injuries to patrons of a restaurant/nightclub situated on the pier, along with significant property damage. Legal actions were filed in Pennsylvania on behalf of the dead and injured persons, the pier owner, and the restaurant/nightclub operator. Among the many defendants named were: S.T. Hudson Engineers, Inc. (Hudson Engineers), an engineering firm; Hudson Construction Consultants, Inc. (Hudson Construction), a construction consulting firm; and Samuel T. Hudson, Robert S. Hudson, and Alan Stoner, employees or officers of either or both of the firms (Hudson parties).
On March 12, 2001, while the underlying personal injury and property damage actions were pending, the Hudson parties filed a declaratory judgment action against defendant Pennsylvania National Mutual Casualty Company (Penn National), seeking insurance coverage and a defense, including counsel fees and costs, under a Comprehensive General Liability (CGL) policy and a Commercial Umbrella (CU) policy issued by Penn National.[1] Penn National answered and counterclaimed, seeking a declaration that it had no obligation under its policy to defend or indemnify the Hudson parties because the underlying claims involved performance of professional services for which there was no coverage. Penn National also sought a declaration that if coverage was found the only policies triggered by the pier collapse were those in effect at the time of the collapse, and that it had no obligation to permit its insureds to select counsel of their choosing.
Eventually, cross-motions for summary judgment were filed. On May 9, 2003, the motion judge denied Penn National's motion for summary judgment, finding that material issues of fact existed as to whether plaintiffs' actions came under the professional services exclusions in the CGL and CU policies. The judge did find, however, that the continuous trigger theory applied, rendering Penn National potentially liable on all its CGL policies from 1994 through 2001. Penn National moved for reconsideration. On June 25, 2003, the judge entered an order granting *1160 partial reconsideration, finding that the continuous trigger applied only to Penn National's potential liability for the property damage claims and not the bodily injury claims.
In January 2004, the underlying personal injury and property damage claims were dismissed as a result of a global settlement. Penn National contributed to the settlement on behalf of the Hudson parties. The Hudson parties moved for a pretrial determination of the legal issues. On April 12, 2004, the judge found that there were allegations in the underlying complaints that fell outside the ambit of professional services and, thus, Penn National owed the Hudson parties a defense under its CGL policy. The order memorializing the judge's decision required Penn National to pay the Hudson parties' defense costs associated with the property damage claims under the policies issued for the terms beginning January 1, 1994, and ending December 31, 2000. The defense costs associated with the personal injury claims were payable under the policy issued for the term beginning January 1, 2000.
A year later, the Hudson parties sought reimbursement for outstanding counsel fees and costs and a declaration that they were successful claimants under R. 4:42-9(a)(6). While the Hudson parties' application was pending, they reached an agreement with Penn National on the amount of the fees, costs, and interest allocated to the underlying litigation and the declaratory judgment action. On May 19, 2005, the judge found in favor of the Hudson parties and ordered Penn National to pay the agreed-upon amount. Separate judgments were entered that same date for counsel fees, costs, and interest incurred in the prosecution of the declaratory judgment action and those incurred in the defense of the underlying litigation.[2] Penn National appeals and we affirm.
We restate only those facts relevant to the disposition of this appeal. Pier 34 was originally built as an earth-filled timber crib structure, approximately 225 feet long by 70 feet wide. The pier was widened and extended to 550 feet long by 100 feet wide in 1909. Portside Investors, L.P. (Portside), the owner of Pier 34, commissioned an engineering study of the pier for development purposes in 1986. In 1991, Portside hired Site Engineers, Inc. to design a foundation for a restaurant building to be placed on the pier. From November 1991 through December 29, 1995, Portside leased the pier and building to Pier 34 Restaurant, L.P. (Pier 34 Restaurant), which operated a restaurant/nightclub. On November 3, 1994, a section of the inshore upriver side of Pier 34 collapsed into the Delaware River. Pier 34 Restaurant retained Hudson Engineers to investigate the collapse, report any findings resulting from that investigation, and make recommendations for repairs. Hudson Engineers issued a report on January 17, 1995, recommending that "a comprehensive condition survey [be conducted] in order to fully detail the exact nature of required repairs" to the pier.
On May 24, 1995, Pier 34 Restaurant entered into a contract with J.E. Brenneman Co. Contracting Engineers (Brenneman), a construction company, to stabilize and repair the inshore upriver collapsed section of the pier. Brenneman's president, Robert Hudson, also an officer of Hudson Engineers, contractually arranged *1161 to have Hudson Engineers designated as engineer for that project.
In August 1995, while the repair work of the upriver section of the pier was ongoing, Pier 34 Restaurant "identified a crack in the seawall at the downriver/outshore end of the pier." As a result, Eli Karetny, an employee of the restaurant, met with Robert Hudson and Jesse Tyson, Brenneman's vice president. At Karetny's request, Brenneman retained Waterfront Constructors, a division of Brenneman, to conduct an underwater diving inspection of the pier. The inspection verified that there were cracks in the seawall and defects in the pier.
In October 1995, Brenneman contracted with Hudson Engineers to perform an underwater diving survey of the outshore end of the pier and to set up mechanisms to monitor the pier to detect any movement. Following the survey, Hudson Engineers advised that the pier "was moving away from the Pennsylvania shore toward New Jersey." Hudson Engineers discussed a method to stabilize the pier with representatives of Portside, Pier 34 Restaurant, and Brenneman. The method was rejected, however, as not practical because it was too costly and would disrupt operations on the pier. Hudson Engineers devised an alternate method using "A-frame" braces on the pilings on the outshore downriver section of the pier. Between November 4 and 6, 1995, six A-frames were installed by Brenneman. Nevertheless, subsequent measurements revealed that the pier had not been stabilized and was still moving away from the shore.
Hudson Engineers monitored the movement of the pier until December 28, 1995. Hudson Engineers claimed that Portside and HMS Ventures Inc. (HMS), a company that eventually purchased the restaurant, terminated the monitoring process because the "readings indicated that movement [of the pier had] slowed down." Portside and HMS denied that they terminated the monitoring.
On January 19, 1996, Portside and Brenneman entered into a contract for the "Reinforcement of Pier 34." Hudson Engineers was designated as the "Engineer" for the project, which entailed the installation of eleven more A-frames. The contract also called for Hudson Engineers to "[p]erform site surveying of pier movement, including recorded data with drawings and notes." There is a significant question, however, whether Hudson Engineers continued to monitor the movement of the pier.
Brenneman stopped operations in 1998, and many of its personnel, including Tyson, began working for or with Commerce Construction Corporation (Commerce). Robert Hudson became an employee of Hudson Construction. He also began consulting for Commerce, where he maintained an office.
In May 1999, at HMS's request, Robert Hudson and Tyson went to Pier 34 to inspect cracks in the asphalt parking lot and in the floor of the building. During that inspection, Robert Hudson observed that the seawall had moved about three-quarters of an inch and that "the A-frames at the outshore end of the pier were twisted, with flanges that were no longer parallel to each other." Robert Hudson directed a Commerce employee to inspect the pier further.
In October 1999, HMS complained to Tyson about a crack in the ballroom floor of the restaurant/nightclub. On May 15, 2000, HMS complained about "a section of the wood deck flooring outshore of the building that was bouncy." In response, Tyson ordered an underwater diving inspection of the pier, which revealed twisted A-frames, sagging deck planks, and pilings *1162 that were leaning to one side. The divers reported that a section of the pier that had been "deflected 2 inches" in 1995 was now "deflected 2 feet."
At depositions, Tyson testified that, on May 17, 2000, he reported the results of the divers' inspection to HMS, but did not indicate at that time that the pier was in imminent danger of collapse. On the morning of May 18, 2000, HMS telephoned Tyson and complained about widening cracks, sheared bolts, and a shifting of the offshore end of the restaurant building. When Tyson visited the pier, he allegedly warned HMS that the pier would collapse that evening. HMS disputes that any such warning was given. Tyson also purportedly told Robert Hudson that "the pier was going to collapse." At about 7:30 p.m. on May 18, 2000, the outshore end of Pier 34 collapsed into the Delaware River.
The CGL policy issued to the Hudson parties by Penn National, which had been in effect and renewed annually since 1994, had general aggregate policy limits of $2,000,000. The CU policy, at the time of the collapse, had general aggregate limits of $4,000,000 with a $10,000 self-retention. The CGL policy included the following:
EXCLUSION  ENGINEERS, ARCHITECTS OR SURVEYORS PROFESSIONAL LIABILITY
. . . .
This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" arising out of the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.
Professional services include:
1. The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and
2. Supervisory, inspection, architectural or engineering activities.
The CGL policy also provided for "[p]roducts-completed operations hazard" coverage, which covered "all `bodily injury' and `property damage' occurring away from premises you own or rent and arising out of `your product' or `your work.'" Under paragraph 19 "[y]our work" included "[t]he providing of or failure to provide warnings or instructions."
Penn National's CU policy also contained an "ENGINEERS, ARCHITECTS OR SURVEYORS PROFESSIONAL LIABILITY" exclusion that was worded slightly differently from the exclusion in its primary CGL policy.
This insurance does not apply to "bodily injury," "property damage," "personal injury" or "advertising injury" arising out of the rendering or failure to render any professional services by or for you, including:
1. The preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications;
2. Supervisory, inspection or engineering services.
At the time of the pier collapse, the Hudson parties were also covered with a professional liability insurance policy issued by Agricultural Insurance Company (Agricultural) with limits of $1,000,000, with a $100,000 deductible. The Agricultural policy covered Hudson Engineers and Hudson Construction for professional services liability assumed under contract or arising out of liability for any "negligent act, error or omission in the performance of . . . professional services." It specifically excluded any claims arising out of services provided by "J.E. Brenneman & Co." *1163 It also provided "that the coverage afforded . . . does not apply to CLAIMS arising out of or caused by . . . completed operations which hazards are to be insured by YOU under a . . . (CGL) policy."
On appeal, Penn National contends that all the allegations in the underlying personal injury and property damage actions came under the mantle of professional services because the alleged negligent conduct arose out of professional services rendered by the Hudson parties and thus were excluded under both its policies. The rules related to construction of the indemnity provisions of insurance policies are well settled.
Generally, the insured has the burden "to bring the claim within the basic terms of the policy." Reliance Ins. Co. v. Armstrong World Indus., Inc., 292 N.J.Super. 365, 377, 678 A.2d 1152 (App. Div.1996) (citing Diamond Shamrock Chems. Co. v. Aetna Cas. & Sur. Co., 258 N.J.Super. 167, 216, 609 A.2d 440 (App. Div.1992), certif. denied, 134 N.J. 481, 634 A.2d 528 (1993)). Where the language of a policy supports two reasonable meanings, one favorable to the insurer and one favorable to the insured, the interpretation supporting coverage will be applied. Simonetti v. Selective Ins. Co., 372 N.J.Super. 421, 428-29, 859 A.2d 694 (App.Div.2004); Ellmex Constr. Co. v. Republic Ins. Co., 202 N.J.Super. 195, 204, 494 A.2d 339 (App.Div.1985), certif. denied, 103 N.J. 453, 511 A.2d 639 (1986); Corcoran v. Hartford Fire Ins. Co., 132 N.J.Super. 234, 243, 333 A.2d 293 (App.Div.1975). Where an insurer claims the matter in dispute falls within exclusionary provisions of the policy, it bears the burden of establishing that claim. Hartford Accident & Indem. Co. v. Aetna Life & Cas. Ins. Co., 98 N.J. 18, 26, 483 A.2d 402 (1984). Coverage clauses are interpreted liberally, whereas exclusions are strictly construed. Butler v. Bonner & Barnewall, Inc., 56 N.J. 567, 576, 267 A.2d 527 (1970); Simonetti, supra, 372 N.J.Super. at 429, 859 A.2d 694; Ellmex, supra, 202 N.J.Super. at 205, 494 A.2d 339. Further, as with any contract, construing insurance policies requires a broad search "for the probable common intent of the parties in an effort to find a reasonable meaning in keeping with the express general purposes of the policies." Royal Ins. Co. v. Rutgers Cas. Ins. Co., 271 N.J.Super. 409, 416, 638 A.2d 924 (App.Div.1994). Finally, insurance contracts are to be interpreted so as to effectuate the reasonable expectations of the insured. Zuckerman v. Nat'l Union Fire Ins. Co., 100 N.J. 304, 320-21, 495 A.2d 395 (1985).
Penn National asserts that the professional services exclusion limiting coverage to personal injury or property damage "arising out of the rendering of or failure to render any professional services by you or . . . on your behalf" should be construed broadly to include any property damage or personal injury "`originating from,' `growing out of,' or `having a substantial nexus' with" the professional activity of its insureds. We disagree. Our trial courts have been "directed to take a broad and liberal view so that the policy is construed in favor of the insured." County of Hudson v. Selective Ins. Co., 332 N.J.Super. 107, 113, 752 A.2d 849 (App.Div.2000) (citing Franklin Mut. Ins. Co. v. Sec. Indemn. Ins. Co., 275 N.J.Super. 335, 340, 646 A.2d 443 (App.Div.), certif. denied, 139 N.J. 185, 652 A.2d 173 (1994)). The more inclusive use of the phrase "arise out of," urged by Penn National, has been to provide coverage, not limit it. See Franklin Mut. Ins. Co., supra, 275 N.J.Super. at 340, 646 A.2d 443; see also Harrah's Atl. City, Inc. v. Harleysville Ins. Co., 288 N.J.Super. 152, 157-59, 671 A.2d 1122 (App.Div.1996); Minkov v. Reliance Ins. Co. of Phila., 54 *1164 N.J.Super. 509, 516-17, 149 A.2d 260 (App. Div.1959).
Penn National also argues that its products-completed operations coverage is subject to the professional services exclusion and thus any injuries arising out of the engineer's failure to warn fall within that exclusion. Again, we disagree. Penn National's professional services liability exclusions define professional services as including "[t]he preparing, approving, or failing to prepare or approve" maps, drawings, opinions, reports, surveys, field orders, change orders, designs or specifications, and supervisory, inspection, architectural or engineering services and activities. The exclusions speak in terms of the various professional services actually performed or conducted.
By contrast, the products-completed operations coverage, for the failure to provide warnings, does not emanate from the performance or failure to perform actual professional services, but from the giving or failure to provide information. The nature of the act or omission in each is different. It is the nature of the act or omission, not the nature of the resulting damage that is determinative of coverage. Search EDP, Inc. v. Am. Home Assurance Co., 267 N.J.Super. 537, 545, 632 A.2d 286 (App.Div.1993), certif. denied, 135 N.J. 466, 640 A.2d 848 (1994). The excluded acts in the CGL policy are the actual professional services, whereas the acts that fall within products-completed operations coverage relate to the giving of information, i.e., instructions and warnings, albeit, resulting from either the performance or non-performance of the contracted-for professional services. Moreover, the Agricultural policy's expressed reference to the inclusion of completed operations coverage in the CGL shows that the two were intended to complement each other. To come to a different conclusion would frustrate the reasonable expectations of the insured. Thus, we conclude that liability for property damage and personal injury resulting from the failure to warn or give instructions was not excluded by the professional services exclusion in the CGL policy.
We next address the duty to defend. The general principles that apply when considering an insurer's duty to defend were enunciated by us in Rosario v. Haywood, 351 N.J.Super. 521, 534-35, 799 A.2d 32 (App.Div.2002):
The duty to defend, which is itself a meaningful benefit, is broader th[a]n the duty to indemnify. Robert W. Hayman, Inc. v. Acme Carriers, Inc., 303 N.J.Super. 355, 357 [696 A.2d 1125] (App.Div. 1997). It is not abrogated by the fact that the claim may have no merit and cannot be maintained against the insured, either in law or in fact, because the cause of action is groundless, false, or fraudulent. Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 173-74 [607 A.2d 1255] (1992). The duty is triggered when the complaint against the insured "states a claim constituting a risk insured against." Danek v. Hommer, 28 N.J.Super. 68, 77 [100 A.2d 198] (App.Div.1953), aff'd o.b., 15 N.J. 573 [105 A.2d 677] (1954). To determine whether an insurer has a duty to defend, the complaint is "laid alongside the policy" to compare the allegations with the language of the policy. Ibid. The duty to defend arises when the comparison reveals that, if the allegations of the complaint are sustained, the insurer will be required to pay any resulting judgment. Any doubts are resolved in favor of the insured. Voorhees, supra, 128 N.J. at 173 [607 A.2d 1255]; Danek, supra, 28 N.J.Super. at 77 [100 A.2d 198]. "Liability of the insured to the plaintiff is not the criterion; it is the *1165 allegation in the complaint of a cause of action which, if sustained, will impose a liability covered by the policy." Ibid. "When multiple alternative causes of action are stated, the duty will continue until every covered claim is eliminated." Voorhees, supra, 128 N.J. at 174 [607 A.2d 1255]. The wording of the complaint need not be articulate so long as a covered claim is made. Ibid.

Extrinsic facts, outside of the complaint, which are later revealed in discovery, may also trigger the duty to defend. SL Indus., Inc. v. Am. Motorists Ins. Co., 128 N.J. 188, 198-99, 607 A.2d 1266 (1992).
In addition to a multiplicity of allegations concerning improper inspection, supervision, architectural and engineering services, all of which would be excluded by the professional services exclusion, the voluminous personal injury Master Long Form Complaint (Master Complaint) in the underlying action alleged that the Hudson parties breached their duty of care under the various contractual relationships by failing to warn the owners, the relevant public authorities and the plaintiff nightclub patrons of the danger that the pier would collapse, despite actual knowledge that the danger existed. Additional paragraphs alleged negligent failure "to disclose the true condition of the pier, despite having direct and personal knowledge of such condition." Other paragraphs alleged negligence in allowing the nightclub to remain open "when defendant[s] knew . . . of the dangerous and defective conditions." There was also a multitude of allegations throughout the Master Complaint asserting that the Hudson parties misrepresented facts concerning the safety of the pier and that the stabilization work was completed, when they knew that neither was true.
The provisions of Section 324A of the Restatement of Torts 2d "have been the law in Pennsylvania for many years." Cantwell v. Allegheny County, 506 Pa. 35, 40, 483 A.2d 1350 (1984) (citing Evans v. Otis Elevator Co., 403 Pa. 13, 18, 168 A.2d 573 (1961); Pascarella v. Kelley, 378 Pa. 18, 105 A.2d 70 (1954)). Section 324A provides:
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
(a) his failure to exercise reasonable care increases the risk of such harm, or
(b) he has undertaken to perform a duty owed by the other to the third person, or
(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.
[Restatement (Second) of Torts § 324A (1965).]
By virtue of their contractual relationships, the Hudson parties had a duty to warn the owners of the pier and restaurant of the danger. Likewise, they had a concomitant duty, under the Restatement, to warn innocent third parties using the pier facilities. The alleged negligent failure to provide such warning represents risks insured against under the CGL policy's products-completed operations coverage. The judge correctly determined that Penn National had a duty to defend the Hudson parties under the express provisions of the CGL policy.
We also conclude that the allegations related to the failure to warn of a known danger and misrepresentation of a condition as safe, when it is known to be dangerous, would not be shielded by a *1166 professional services exclusion even in the absence of a completed operations provision. To be sure, allegations respecting a professional's failure to provide adequate engineering, supervisory, inspection, or architectural services or to discover or remedy a condition for which the professional services were engaged would necessarily fall within the exclusion as dependent on the professional services provided. However, allegations encompassing the violation of a duty to provide information about a known danger resulting from either a negligent omission or commission, whether based upon the relationship of the parties or legal principle, are not dependent on the rendering of professional services. Instead, such allegations arise from the information actually possessed and not provided by a party obligated to disclose such information. Thus, for example, Robert Hudson's alleged failure to advise the owners of the pier and nightclub that the pier was in imminent risk of collapsing, after obtaining that information from Tyson, would not be excluded simply because he had previously done engineering work. So too, any negligent misrepresentation regarding the condition of the pier would relate to the appropriate disclosure of known information, rather than the failure to provide professional services.
Coverage existed for the Hudson parties, under the Penn National policy in effect at the time of the collapse, for those allegations in the Master Complaint asserting negligent misrepresentation and failure to warn. Our decision renders moot the issue regarding the judge's findings that the continuous trigger of coverage applied. We, therefore, decline further discussion of that issue. See Bankers Trust Co. of Cal., N.A. v. Delgado, 346 N.J.Super. 103, 106 n. 1, 787 A.2d 195 (App.Div.2001) (citing Zirger v. Gen. Accident Ins. Co., 144 N.J. 327, 330, 676 A.2d 1065 (1996)).
Penn National argues that even if the judge correctly concluded that it was obligated to defend allegations found in the underlying action, the Hudson parties are not entitled to an award of legal fees under R. 4:42-9(a) because they were not successful claimants. Eight days following the collapse, the Hudson parties' coverage counsel met with representatives of Penn National. On June 13, 2000, coverage counsel advised Penn National that, even though the underlying complaints had not yet been filed, it was anticipated that there would be allegations that would involve conflicting covered and uncovered claims, requiring representation by private counsel. On July 6, 2000, Penn National responded, explaining its view of the professional services exclusion, reserving its rights, and indicating that it was investigating the incident.
On October 2, 2000, coverage counsel wrote to Penn National's litigation specialist, advising that he had received the first Writ of Summons. Counsel referred to his previous correspondence and demanded a defense. By November 10, 2000, coverage counsel forwarded to Penn National copies of the complaints filed as of that date against the Hudson parties. On November 30, 2000, Penn National wrote to coverage counsel, referencing the professional services exclusion, as well as its position regarding lack of coverage. It also advised that, although it did not believe that it had an obligation to defend or indemnify the Hudson parties, it would retain the services of a firm of its choosing to represent the Hudson parties until there was a final determination that none of the claims were covered. Coverage counsel responded that, in view of its previous discussions regarding conflicts, his client could not accept Penn National's selection of counsel.
*1167 In January 2001, coverage counsel forwarded the Master Complaint to Penn National, again demanding a defense for the Hudson parties. Penn National did not respond. The Hudson parties filed their March 2001 declaratory judgment complaint. On October 15, 2001, Penn National agreed that it would provide the Hudson parties' individual personal attorneys with partial defense funding. However, the agreement was without prejudice to Penn National's position of non-liability under Burd v. Sussex Mut. Ins. Co., 56 N.J. 383, 267 A.2d 7 (1970).[3] Thus, prosecution of the Hudson parties' declaratory judgment suit continued.
Relying on the October 2001 agreement and its voluntary contribution to the settlement of the underlying claims, Penn National posits that it never denied coverage and never refused to provide a defense. It argues that the Hudson parties "sued [it], despite the fact that [it] had already agreed to provide a defense for [the Hudson parties] under a reservation of rights" and contributed to the settlement of the underlying actions. Penn National also maintains that it agreed to provide a defense prior to the commencement of the Hudson parties' declaratory judgment action. These contentions are contrary to the record and devoid of merit.
Initially, we note that Penn National's contention that it "agreed" to provide a defense prior to the commencement of the Hudson parties' coverage suit is not supported by the record. Its first offer to provide a single firm to represent the Hudson parties was rejected by coverage counsel. The conditional agreement to pay personal counsel, arrived at in October 2001, was not consummated until eight months after the complaint was filed. Penn National's contention that it did not refuse to provide a defense disregards the expressed provisions of the October 2001 agreement whereby it reserved its right to continue to defend against counsel-fee liability under Burd. Also, Penn National's assertion that it never denied coverage ignores its attempt to dismiss the declaratory judgment on summary judgment based upon its argument that the allegations in the underlying action fell within the ambit of the professional services exclusion.
Penn National's settlement of the underlying case was neither determinative of the issues of coverage nor of its obligation to provide a defense. See, e.g., Transamerica Ins. Co. v. Nat'l Roofing, Inc. 108 N.J. 59, 65, 527 A.2d 864 (1987) (remanding the insurer's declaratory judgment for a determination of the merits of a coverage dispute despite the subsequent settlement of the underlying action by the insurer). R. 4:42-9(a)(6) provides in pertinent part: "No fee for legal services shall be allowed in the taxed costs or otherwise, except . . . In an action upon a liability or indemnity policy of insurance, in favor of a successful claimant." Indeed, "[t]he rule permitting allowance of fees is generally applicable when an insured is successful in obtaining defense costs even though unsuccessful in obtaining indemnity under the policy." Sears Roebuck & Co. v. Nat'l Union Fire Ins. Co., 340 N.J.Super. 223, 243, 774 A.2d 526 (App.Div.) (remanding for a determination of counsel fees incurred by an insured up until the time that summary judgment was granted in favor of the insured in the underlying action) (citing Schmidt v. Smith, 294 N.J.Super. *1168 569, 591, 684 A.2d 66 (App.Div.1996), aff'd, 155 N.J. 44, 713 A.2d 1014 (1998)), certif. denied, 169 N.J. 608, 782 A.2d 426 (2001).
Finally, in its appellate brief, Penn National argues that although it "does not agree that Hudson was entitled to `independent' counsel, the point is irrelevant . . . because Hudson did not prevail on . . . this argument in any of its motions" and "not a single order" compelled it to pay for independent counsel. The record, however, reflects that Penn National continued to maintain that it was not obligated to pay individual personal counsel fees under Burd, even after the judge's April 2004 determination requiring it to provide a defense.[4] In reaching his May 19, 2005, determination that the Hudson parties were successful claimants, the motion judge indicated that he reviewed and considered Burd in arriving at his decision. Moreover, by agreeing to the appropriate amount of counsel fees, Penn National voluntarily removed from consideration the issue of what should be apportioned as reasonable and appropriate fees to be paid to the independent counsel representing the various Hudson parties in the underlying suit for defense of the covered claims.
Affirmed.
NOTES
[1] The declaratory judgment complaint, which also sought compensatory and punitive damages, was later amended, deleting the request for punitive damages.
[2] Judgment of $391,555.56 in counsel fees and costs together with three percent interest was entered in favor of the Hudson parties for prosecuting the declaratory judgment action and $59,644.36 in costs and fees together with three percent interest was entered in favor of the Hudson parties for the defense of the underlying action.
[3] "Whenever the carrier's position so diverges from the insured's that the carrier cannot defend the action with complete fidelity to the insured, there must be a proceeding in which the carrier and the insured, represented by counsel of their own choice, may fight out their differences." Burd, supra, 56 N.J. at 391, 267 A.2d 7.
[4] The transcript provided only the judge's May 19, 2005, decision and not the arguments of counsel. However, the judge made reference to the arguments and that the parties had agreed on the amount, thus relieving him from determining the reasonable and appropriate fees for services rendered for the defense of the underlying action and the declaratory judgment action.