**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1486-23

ESTATE OF MIKE ALEXANDER,
deceased, by LORRAINE
ALEXANDER as Executrix of the
Estate, and LORRAINE
ALEXANDER, individually,

      Plaintiffs-Appellants,

v.

NORTHEAST SWEEPERS,
CHRISTOPHER M. HACKETT,
TRI-STATE EQUIPMENT
REBUILDING, NEW JERSEY
TURNPIKE AUTHORITY, NEW
JERSEY DEPARTMENT OF
TRANSPORTATION, and NEW
JERSEY STATE POLICE,

      Defendants,

and

CRISDEL CONSTRUCTION,
FERREIRA CONSTRUCTION,
ATHEY PRODUCTION
CORPORATION, HAKS ENGINEERS,
ARCHITECTS AND LAND
SURVEYORS, PC, and JOHNSON,

MIRMIRAN &  THOMPSON,

    Defendants-Respondents.

_____

Argued April 1, 2025 – Decided June 19, 2025

Before Judges Gilson, Firko, and Augostini.

On appeal from the Superior Court of New Jersey, Law
Division, Essex County, Docket No. L-7229-14.

Timothy J. Foley argued the cause for appellants
(Vlasac & Cassidy, LLC, attorneys; John M. Vlasac, of
counsel and on the briefs).

Christopher R. Paldino argued the cause for respondent
Crisdel Group, Inc. (Chiesa Shahinian & Giantomasi,
PC, attorneys; Christopher R. Paldino and Alexander T.
Payne, on the brief).

Timothy K. Saia argued the cause for respondent
HAKS Engineers, Architects and Land Surveyors, PC
(Bennett, Bricklin & Saltzburg, LLC, attorneys;
Timothy K. Saia, of counsel and on the brief).

Jason Attwood argued the cause for respondent
Johnson, Mirmiran & Thompson, Inc. (Attwood
Corlett, LLC, attorneys; Dawn Attwood, on the brief).

PER CURIAM

While working in an active construction zone on the New Jersey Turnpike,

Michael Alexander was tragically killed when he was struck by a sweeper truck.

The sweeper truck was owned by defendant Northeast Sweepers (Northeast) and

had been driven by defendant Christopher M. Hackett. Plaintiffs, Alexander's estate and his surviving widow, settled their claims against Northeast and Hackett. See Est. of Alexander v. Gemini Ins. Co. (Alexander II), No. A-2773-20 (App. Div. July 11, 2023) (slip op. at 3) (noting that an insurer had already "tendered its $1 million [insurance] policy" on behalf of Northeast and Hackett).

In this appeal, plaintiffs challenge three orders granting summary judgment to defendants Crisdel Group, Inc. (Crisdel), HAKS Engineers, Architects and Land Surveyors, P.C. (HAKS), and Johnson, Mirmiran & Thompson, Inc. (JMT). Crisdel was Alexander's employer and was granted summary judgment when the trial court found that there was no evidence that Crisdel committed an intentional wrong related to the accident and, therefore, it was shielded from liability under the Workers' Compensation Act (the WC Act), N.J.S.A. 34:15-1 to -147.

HAKS and JMT were a contractor and subcontractor retained to provide professional "engineering services covering all construction supervision of the construction work" for the Turnpike resurfacing project. They were granted summary judgment because plaintiffs failed to submit affidavits of merit stating that HAKS and JMT had deviated from their professional standard of care as engineers.

A-1486-23

Our review of the record confirms that plaintiffs failed to present evidence showing that Crisdel committed an intentional wrong within the meaning of the WC Act. We, therefore, affirm the order granting summary judgment in favor of Crisdel. The record and the law also establish that HAKS and JMT were acting as engineers when they oversaw the construction on the Turnpike resurfacing project. Therefore, we affirm the orders granting summary judgment in favor of HAKS and JMT because plaintiffs failed to submit the required affidavits of merit.

I.

We discern the facts from the extensive record, which includes two prior appeals. We view the facts in the light most favorable to plaintiffs, the non-moving parties. Crisitello v. St. Theresa Sch., 255 N.J. 200, 218 (2023) as revised (Aug. 14, 2023).

Before July 2014, the New Jersey Turnpike Authority (NJT Authority) retained several contractors in connection with a project to resurface portions of the Turnpike. Crisdel was hired as the general contractor and was responsible for milling and paving operations. Alexander, who worked for Crisdel, had served as a milling foreman on the resurfacing project.

A-1486-23

NJT Authority retained HAKS to provide "professional services" for the resurfacing project. The professional services included "engineering services covering all construction supervision of the . . . construction work." In that regard, HAKS was to supervise all construction to "ensure . . . compliance with the [c]ontract [p]lans and [s]pecifications."

As part of its contract, HAKS agreed to provide appropriate personnel, including a "[p]roject [m]anager" and "[r]esident [e]ngineer." The project manager was required to be a professional engineer licensed in New Jersey. John Schweppenheiser, a HAKS employee and licensed professional engineer, was the project manager for the Turnpike resurfacing project.

HAKS subcontracted the construction inspection services to JMT. Lawrence Fink, a JMT employee and licensed professional engineer, acted as JMT's supervisor for the project. The subcontract agreement between HAKS and JMT provided that "[i]f the work to be performed by the [s]ubconsultant is of a professional nature, the work shall be performed under the direct supervision of a licensed professional consultant."

JMT also supplied the resident engineer, James Edgar. The resident engineer was required to be either (1) a licensed professional engineer; (2) a person with at least ten years of relevant experience, including five years as a

5

full-time resident engineer; or (3) a transportation engineering technician, certified by the National Institute for Certification in Engineering Technologies (NICET). Edgar was not a licensed engineer; rather, he was a transportation engineering technician, certified by NICET. Edgar reported to Fink and Schweppenheiser.

On July 11, 2014, at approximately 11:00 p.m., Alexander was struck by a sweeper truck, which was owned by Northeast and operated by Hackett. Alexander was taken to a hospital and passed away approximately one month later. At the time that Alexander was struck by the sweeper, he was wearing a reflective safety vest and hard hat. He also had a flashlight, which had been turned on.

The resurfacing work area consisted of two lanes of the turnpike and the right shoulder. On the night of the accident, there were numerous machines and vehicles operating in the work area. Crisdel had twelve pieces of machinery, including milling and paving equipment. Additionally, there were two sweepers and at least five dump trucks.

The work area was illuminated by the lights from various vehicles and the moon. There were no light towers. The sweeper trucks and milling machines had lights, which pointed several feet directly behind each vehicle. The sweeper

A-1486-23

trucks and milling machines also had backup alarms, but the milling and paving work generated a great deal of noise in the work area.

Workers at the scene had not gone over a written traffic control plan before the accident. The workers had gathered at the outset of the night to discuss where they would be operating and what they would be doing that night. There were no flag persons or spotters.

Hackett had over 15,000 hours of experience in operating the sweeper and Northeast considered him to be a "senior operator." Before the accident, some workers, including Alexander, had discussed that Hackett was a "dangerous operator." Indeed, approximately one week beforehand, Alexander had allegedly brought his concerns to the attention of William Weaver, Crisdel's project manager for the NJT Authority contract. There were, however, no formal complaints regarding Hackett or his job performance.

It was Crisdel's practice to assign a dump truck to each sweeper truck for efficiency and safety reasons. At the time of the accident, however, no dump truck was near Hackett's sweeper. The accident occurred when Hackett drove his sweeper around a milling machine and struck Alexander. At his deposition, Hackett testified: "I think it was my error. I missed [Alexander] in my line of sight. And I'm responsible for a human life."

7

After the accident, the Occupational Safety and Health Administration (OSHA) conducted an investigation and cited Crisdel for violations of Section 5(a)(1) of the OSHA Act of 1970. In its first claim, OSHA determined that Crisdel had failed to "furnish employment and a place of employment which were free from recognized hazards that were causing or likely to cause death or serious physical harm to employees," and failed to "establish a pre-planned traffic pattern for pedestrian and construction traffic . . . to ensure the safety of the employees working and walking within the construction work zone." The "type of violation" was noted as "serious," not "willful" or "repeat[ed]." OSHA also determined that Crisdel did not provide sufficient training to allow employees to recognize unsafe working conditions. That "type of violation" was again noted as "serious." Crisdel contested the citation and provided OSHA with information related to its traffic control protocols for the project. Thereafter, OSHA withdrew its second claim against Crisdel and edited the remaining claim to remove the language related to traffic control.

In October 2014, plaintiffs filed a complaint alleging claims related to the death of Alexander. Initially, they named numerous defendants, including Northeast, Hackett, Crisdel, and the NJT Authority. In January 2016, plaintiffs amended their complaint to add claims against HAKS and JMT.

In their amended complaint, plaintiffs alleged that Crisdel had engaged in conduct that constituted intentional wrongs and resulted in Alexander's death. Concerning HAKS and JMT, plaintiffs alleged that those defendants "were responsible for the operation, design, control, supervision, maintenance, inspection and/or creation of a system of oversight with regard to the project." Plaintiffs then alleged that HAKS and JMT negligently supervised the project, and that the negligence was the proximate cause of the sweeper truck striking and killing Alexander.

Alexander and his estate had received workers' compensation benefits related to the accident. Accordingly, in Crisdel's answer it asserted the affirmative defense that plaintiffs' claims were barred by the WC Act.

In its answer, HAKS demanded compliance with the affidavit of merit statute, N.J.S.A. 2A:53A-26 to -29. JMT made no reference to the affidavit of merit statute in its answer, but it did assert a general defense of failure to state a claim. The case was assigned to Track II, as a personal injury case. No party sought to have the case re-assigned to Track III, as a professional malpractice case. As a result, the trial court did not hold a Ferreira conference.[1]

---

[1] In Ferreira v. Rancocas Orthopedic Associates, 178 N.J. 144, 147 (2003), the New Jersey Supreme Court directed trial courts to hold a case management

In June 2017, HAKS and JMT moved to dismiss the claims against them for failure to serve affidavits of merit. In response, plaintiffs contended that they were not alleging professional malpractice against HAKS or JMT. Instead, plaintiffs asserted that HAKS and JMT had committed "ordinary negligence."

On August 4, 2017, after hearing oral argument, the trial court issued orders dismissing the claims against HAKS and JMT because plaintiffs had failed to submit affidavits of merit. The trial court reasoned, in relevant part, that the negligence asserted by plaintiffs against HAKS and JMT was negligence in their professional capacities as engineers.

Plaintiffs thereafter filed a motion for reconsideration and submitted two affidavits from professional engineers: John Nawn and Nicholas Bellizzi. Both experts certified that the work performed by HAKS and JMT did not involve professional engineering services; rather, the work involved "incident construction supervision services." Plaintiffs' experts opined that Edgar was "negligent in his supervision of construction services and compliance with the [c]ontract specifications." Furthermore, the experts opined that Fink and Schweppenheiser were negligent in their supervision of Edgar.

conference in malpractice actions before the deadline for filing an affidavit of merit to discuss the requirements for serving an affidavit and any related issues.

10 A-1486-23

After hearing oral argument, the trial court denied the motion for reconsideration in an order issued on September 15, 2017. We then granted plaintiffs leave to appeal and reversed the orders dismissing plaintiffs' claims against HAKS and JMT. Est. of Alexander v. Northeast Sweepers (Alexander I), No. A-1123-17 (App. Div. Apr. 19, 2018) (slip op. at 2). We concluded that a more complete record was required to determine whether plaintiffs' claims implicated the affidavit of merit requirement. Id. at 13. In that regard, we stated: "Whether Edgar was acting under the supervision of licensed engineers or acting in a non-engineering capacity is a question of fact that requires more development than exists in the current record." Ibid. We therefore directed that on remand the parties were to engage in further discovery. Id. at 13-14. We also noted that "the question of Edgar's role may be appropriately subject to a future motion for summary judgment or possibly an N.J.R.E. 104 hearing." Id. at 14.

On remand, the parties pursued additional expert discovery. Plaintiffs produced reports from three experts: Nawn, Bellizzi, and William Gulya, Jr., an excavating, trenching, and site work expert. In addition, JMT produced an expert report by Keith Bergman, a professional engineer, HAKS produced an expert report by Scott Derector, a professional engineer, and NJT Authority

produced an expert report by Craig Moskowitz, a professional engineer. The experts were then deposed.

In April 2018, Crisdel moved for summary judgment to dismiss all plaintiffs' claims against it. On June 22, 2018, after hearing oral argument, the trial court granted summary judgment in favor of Crisdel. The trial court found that plaintiffs had failed to produce evidence that would allow a reasonable trier of fact to conclude that Crisdel had committed an intentional wrong within the meaning of the WC Act. The trial court also reasoned that the accident that caused Alexander's death was in the nature of the type of accidents that occur in construction areas.

In May 2019, following the completion of the expert discovery, JMT and HAKS again moved for summary judgment. They argued that plaintiffs' claims against them involved malpractice claims concerning professional engineering services. The trial court agreed and granted summary judgment to JMT and HAKS in separate orders filed on July 26, 2019. In a written opinion, the trial court reasoned that the expert reports and deposition testimony showed that "the inspection and oversight duties of HAKS and JMT [fell] squarely within 'the practice of engineering.'" Accordingly, the trial court held that plaintiffs were required to submit an affidavit of merit in accordance with N.J.S.A. 2A:53A-27

and that their failure to do so required a dismissal of their claims against HAKS and JMT.

The trial court also dismissed the claims against the NJT Authority, but plaintiffs have not appealed from that order. All other defendants were also dismissed from the action at various times. Thereafter, in December 2023, plaintiffs resolved and dismissed with prejudice their claims against Northeast and Hackett.[2]

Plaintiffs now appeal the June 22, 2018 order granting summary judgment to Crisdel, and the July 26, 2019 orders granting summary judgment to HAKS and JMT.

II.

Appellate courts review a grant of summary judgment de novo, "applying the same standard used by the trial court." Samolyk v. Berthe, 251 N.J. 73, 78 (2022) (citing Woytas v. Greenwood Tree Experts, Inc., 237 N.J. 501, 511 (2019)). Summary judgment should be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and

---

[2] Plaintiffs had also filed a declaratory judgment action against two of the three companies who insured Northeast. We affirmed an order granting summary judgment to the two insurance companies. Alexander II, slip op. at 9.

that the moving party is entitled to a judgment or order as a matter of law." Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021) (quoting R. 4:46-2(c)) (internal quotation marks omitted). "An issue of material fact is 'genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.'" Grande v. Saint Clare's Health Sys., 230 N.J. 1, 24 (2017) (quoting Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)).

## III.

Plaintiffs contend that the trial court erred in granting summary judgment to Crisdel because they presented evidence from which a jury could find that Crisdel committed intentional wrongs related to the accident that caused Alexander's death. The record and the law do not support that argument.

The WC Act reflects a "historic trade-off whereby employees relinquished their right to pursue common-law remedies in exchange for automatic entitlement to certain, but reduced, benefits whenever they suffered injuries by accident[s] arising out of and in the course of employment." Rodriguez v. Shelbourne Spring, LLC, 259 N.J. 385, 395 (2024) (quoting Millison v. E.I. Du Pont de Nemours & Co., 101 N.J. 161, 174 (1985)). "Accordingly, workers'

compensation is the exclusive remedy for injured employees who qualify under the [WC] Act." Id. at 395-96.

"The only exception to that 'exclusivity bar' or 'workers' compensation bar' is for injuries caused by 'intentional wrongs,' for which an employee may still seek redress under common law causes of action." Id. at 396 (first citing Millson, 101 N.J. at 177; and then citing Schmidt v. Smith, 155 N.J. 44, 49 (1998)). To prove an intentional wrong under the WC Act, a plaintiff must show:

> (1) the employer must know that his actions are substantially certain to result in injury or death to the employee, and (2) the resulting injury and the circumstances of its infliction on the worker must be (a) more than a fact of life of industrial employment and (b) plainly beyond anything the Legislature intended the [WC Act] to immunize.
>
> [Richter v. Oakland Bd. of Educ., 246 N.J. 507, 536 (2021) (quoting Laidlow v. Hariton Mach. Co., 170 N.J. 602, 617 (2002)) (internal quotation marks omitted).]

An employer need not subjectively desire to harm an employee, but the employer must know that the "consequences of [the employer's] acts are substantially certain to result in such harm." Laidlow, 170 N.J. at 613. The New Jersey Supreme Court has explained that "the 'substantial certainty' test is still a high standard to meet: to avoid allowing employees to circumvent the

[WC] Act, courts 'must demand a virtual certainty' before employees can proceed under the intentional wrong exception to sue their employer in tort." Rodriguez, 259 N.J. at 396 (quoting Van Dunk v. Reckson Assocs. Realty Corp., 210 N.J. 449, 470 (2012) (quoting Millison, 101 N.J. at 178)).

Plaintiffs identified six specific areas of safety protocols or devices that were allegedly known to and ignored by Crisdel on the night of the accident. Those areas included (1) work lighting, (2) audible backup alarms, (3) properly functioning mirrors, (4) dedicated dump trucks, (5) the use of spotters, and (6) a written traffic control plan. Plaintiffs also argue that Crisdel ignored the complaints concerning Hackett's dangerous operation of the sweeper and failed to learn from prior incidents.

None of the evidence pointed to by plaintiffs constitutes evidence of an intentional wrong within the meaning of the WC Act. There was undisputed evidence that the work area was illuminated by lights on numerous vehicles, including lights that shined behind the sweeper trucks when they were backing up. Although the evidence also establishes that there were no light towers, the lack of such towers does not establish an intentional wrong. In that regard, plaintiffs presented no evidence that the lack of light towers made it almost a

certainty that a worker would be struck by a sweeper truck that had a light shining behind it as it backed up.

The evidence is also undisputed that both the milling machines and the sweepers had backup alarms. Plaintiffs' real contention is that the noise in the work area drowned out those alarms. While that is obviously a concern, it does not rise to the level of an intentional wrong within the meaning of the WC Act.

In terms of functioning mirrors, plaintiffs point to testimony that the rearview mirror on the sweeper operated by Hackett had been taped on. There was no evidence, however, that Hackett was unable to see out of or use the mirror. Indeed, Hackett candidly testified that he missed Alexander in his line of sight, and he did not blame that on the mirror.

That a dedicated dump truck was not present at the time of the accident does not establish an intentional wrong. Weaver testified that "when the [dump] trucks . . . that are assigned to the sweepers are full and heading [back] to the plant, it is a matter of replacing that truck," and that "there could be a little time gap between . . . one truck leaving and the other truck coming into position." John Nash, the Crisdel superintendent for the worksite, further testified that there had likely been a dump truck assigned to the sweeper on the night of the accident. At some point, however, that dump truck would have been filled up

17

and driven away. That the accident occurred in the gap before it could be replaced does not establish an intentional wrong.

Next, regarding spotters, they were not required by OSHA or routinely utilized by Crisdel at all construction sites. Moreover, plaintiff presented no evidence that spotters are uniformly used at road construction work sites and that the lack of spotters created a likely certainty that a truck would hit a worker.

Finally, that there was no written traffic plan also does not establish an intentional wrong by Crisdel. Testimony corroborated that Crisdel employees engaged in "some talk about internal traffic controls in the construction area" on the night of the accident, and that those controls were "pretty much the same every night on that particular job." Accordingly, Crisdel employees would have had some level of familiarity with the internal traffic control plan. Just as importantly, no evidence was presented that the lack of a plan made it highly likely that a truck would strike a worker.

Plaintiffs also rely on the prior complaints regarding Hackett's operation of the sweeper, prior construction site accidents, and OSHA citations issued against Crisdel. There were, however, no formal complaints regarding Hackett's job performance and he was not previously involved in any accidents while operating a sweeper. Regarding the three prior fatal accidents, those accidents

were factually dissimilar and did not go directly to the causes that led to the accident involving Alexander.

Concerning the OSHA violations, plaintiff concedes that there were no prior OSHA citations at the NJ Turnpike job site. The subsequent OSHA violations cited Crisdel for "serious" issues but not "willful" violations. Moreover, the New Jersey Supreme Court has explained that OSHA safety violations do not, on their own, establish the virtual certainty required to prove an intentional wrong. Van Dunk, 210 N.J. at 470-71. See also Laidlow, 170 N.J. at 622-23 ("Our holding is not to be understood as establishing a per se rule that an employer's conduct equates with an 'intentional wrong' . . . whenever that employer . . . commits some other OSHA violation."). Instead, the Court has instructed that OHSA violations are simply "factors to be considered, given the particular facts of the case." Van Dunk, 210 N.J. at 463. Here, the facts of this case do not establish that Crisdel's conduct satisfied the substantial certainty test required to prove an intentional wrong under the WC Act.

IV.

Plaintiffs next argue that the trial court erred in granting summary judgment to HAKS and JMT, contending that their claims against those

defendants were not claims of professional malpractice by engineering firms. The record and the law, however, rebut plaintiffs' contentions.

When a plaintiff asserts a claim against a licensed professional covered by the affidavit of merit statute, the statute requires the plaintiff to "produce an affidavit from an expert attesting to the merits of the claim." Moschella v. Hackensack Meridian Jersey Shore Univ. Med. Ctr., 258 N.J. 110, 113 (2024) (quoting Meehan v. Antonellis, 226 N.J. 216, 230 (2016)). The affidavit of merit must be submitted within sixty days of the filing of the answer by defendant and that deadline can only be extended by an additional sixty days. See N.J.S.A. 2A:53A-27. See also Wiggins v. Hackensack Meridian Health, 259 N.J. 562, 575 (2025) (explaining the requirements for obtaining an affidavit of merit).

The purpose of the statute is to "weed out frivolous lawsuits early in the litigation" while ensuring that "meritorious claims [are heard] in court." Ibid. (quoting Ferreira, 178 N.J. at 150) (internal quotation marks omitted). "[S]ubmission of an appropriate affidavit of merit is considered an element of the claim." Meehan, 226 N.J. at 228 (citing Alan J. Cornblatt, P.A. v. Barow, 153 N.J. 218, 244 (1998)). Accordingly, if an affidavit is not provided within 120 days of the answer, the claims will generally be dismissed with prejudice. Paragon Contractors, Inc. v. Peachtree Condo. Ass'n, 202 N.J. 415, 422 (2010)

20

(citing Cornblatt, 153 N.J. at 247); see also Ferreira, 178 N.J. at 150 (holding that "plaintiff's failure to serve the affidavit within 120 days . . . is considered tantamount to the failure to state a cause of action").

A "licensed person" includes a person who is licensed as an engineer. N.J.S.A. 2A:53A-26(e). The statute governing the licensing of engineers in New Jersey defines the terms "practice of engineering" and "professional engineering" as:

> [A]ny service or creative work the adequate performance of which requires engineering education, training, and experience and the application of special knowledge of the mathematical, physical and engineering sciences to such services or creative work as consult[ants] . . . and the administration of construction for the purpose of determining compliance with drawings and specifications; any of which embraces such services or work, either public or private, in connection with any engineering project . . . insofar as they involve safeguarding life, health or property, and including such other professional services as may be necessary to the planning, progress and completion of any engineering services.
>
> [N.J.S.A. 45:8-28(b).]

In determining whether the affidavit of merit statute applies to a case, the focal point is "the nature of the legal inquiry" and not merely "the label placed on the action." Couri v. Gardner, 173 N.J. 328, 340 (2002). In that regard, the New Jersey Supreme Court has explained:

21

[W]hen presented with a tort or contract claim asserted against a professional specified in the statute, rather than focusing on whether the claim is denominated as tort or contract, . . . courts should determine if the claim's underlying factual allegations require proof of a deviation from the professional standard of care applicable to that specific profession. If such proof is required, an affidavit of merit is required for that claim, unless some exception applies.

[Ibid. (citing Hubbard v. Reed, 168 N.J. 387, 390 (2001)).]

It is undisputable that HAKS and JMT are both engineering and architectural companies. It is also undisputable that HAKS was retained by NJT Authority to provide professional engineering services. In that regard, the "[p]roject [d]escription" noted that the work was "construction" work to "resurfac[e] . . . areas . . . on the [NJ] Turnpike." Moreover, as part of their contract with NJT Authority, HAKS was to abide by a "professional standard of care" and provide "[p]rofessional [s]ervices." Further, HAKS was required to obtain "Professional Liability Insurance," which covers parties performing professional services as defined in N.J.S.A. 2A:53A-26. See Mortg. Grader, Inc. v. Ward & Olivo, L.L.P., 225 N.J. 423, 435-36 (2016); S.T. Hudson Eng'rs, Inc. v. Pa. Nat. Mut. Cas. Co., 388 N.J. Super. 592, 602-03 (App. Div. 2006).

HAKS, in turn, retained JMT as a subcontractor to provide "[c]onstruction [i]nspection [s]ervices." Under the terms of the subcontract, all professional

work performed by JMT was required to be done under the "direct supervision" of "licensed professional" engineers.  As part of its contract, HAKS also agreed to provide appropriate personnel, including a project manager and a resident engineer.  The project manager was required to be a professional engineer licensed in New Jersey.  JMT supplied the resident engineer, Edgar.

Plaintiffs focus their claim of negligence against Edgar.  In that regard, they submitted expert reports that opined that Edgar was not acting as a licensed engineer; rather, he was acting as a supervisor of construction activity.  There are several legal flaws with plaintiffs' theory.  The undisputed facts established that Edgar worked under the supervision of Fink and Schweppenheiser, both of whom were licensed engineers.  More critically, plaintiffs and their experts both alleged that Edgar was negligent in supervising the milling and paving construction activity.  HAKS and JMT, however, only had responsibility for supervising that activity to ensure its compliance with the contracts and specifications.  That work is expressly identified as engineering work under N.J.S.A. 45:8-28(b).  See N.J.S.A. 45:8-28(b) (defining "professional engineering" as including "the administration of construction for the purpose of determining compliance with drawings and specifications").

Plaintiffs correctly point out that Edgar was not a licensed engineer. Plaintiffs, however, did not sue Edgar. Instead, they sued Edgar's employer JMT, which is a licensed engineering and architectural consulting company. Plaintiffs also sued HAKS, which is a licensed professional engineering company. The deposition testimony establishes that Edgar worked under the supervision of Fink and Schweppenheiser. Moreover, the work Edgar was performing in supervising construction activity was work that falls within the ambit of the "practice of engineering."

Accordingly, the material, undisputed evidence established that HAKS and JMT were providing professional engineering services on the Turnpike project. Plaintiffs, therefore, were required to serve timely affidavits of merit to support their claims against HAKS and JMT. Plaintiffs, however, did not file timely affidavits of merit.

In making their claims against HAKS and JMT, plaintiffs rely on Haviland v. Lourdes Medical Center of Burlington County, Inc., 250 N.J. 368 (2022). The facts and rationale of Haviland, however, do not apply to this case.

In Haviland, the plaintiff alleged that a radiology technician asked him to hold weights contrary to the instructions of his physician and those weights caused him to sustain an injury to his newly repaired shoulder. 250 N.J. at 373.

The plaintiff sued the medical center and the technician. Ibid. The medical center moved to dismiss plaintiff's claim on the ground that plaintiff failed to serve an affidavit of merit. Id. at 374. The trial court granted that motion. Ibid. We reversed, holding that an affidavit of merit was not required under the circumstances presented. Ibid.

The Supreme Court granted certification and held that the affidavit of merit statute "does not require submission of an [affidavit of merit] to maintain a vicarious liability claim against a licensed health care facility based on the conduct of its non-licensed agents or employees." Id. at 383-84. The Court emphasized that the plaintiff did not raise "any direct claims against the hospital for negligent hiring, training, or supervision of the non-licensed employee." Id. at 384. The Supreme Court also clarified that if the plaintiff had pursued a direct claim, it would have been properly dismissed for failure to provide a timely affidavit of merit. Ibid.

As just noted, plaintiffs in this action are not suing Edgar. They asserted direct claims of negligence against HAKS and JMT. Moreover, plaintiffs did not allege any facts showing that Edgar's actions or inactions led to Alexander's accident. Instead, plaintiffs allege that HAKS and JMT were negligent in designing, controlling, and supervising the milling and paving activity at the

25

time that Alexander was struck by the sweeper truck. In other words, plaintiffs' claim is not a claim of vicarious liability based on the alleged negligence of Edgar. See Gilligan v. Junod, 474 N.J. Super. 39, 48 (App. Div. 2022) (explaining the application of Haviland). Instead, plaintiffs' claims are against HAKS and JMT and require the submission of affidavits of merit. Ibid.

Ironically, plaintiffs' submission of expert reports confirms that they are alleging malpractice claims. Plaintiffs belatedly recognized that they needed experts to support their claims against HAKS and JMT. Their experts alleged that HAKS and JMT deviated from the appropriate standard of care. The only applicable standard of care that HAKS or JMT could be deviating from, however, were engineering standards.

Consequently, the full record demonstrates that plaintiffs could not make simple claims of negligence against HAKS and JMT. Instead, the undisputed facts establish that plaintiffs were seeking to hold HAKS and JMT liable for failure to maintain appropriate engineering standards of care in supervising the construction activity on the Turnpike. Those claims required affidavits of merit and because no affidavits were timely submitted, the trial court properly granted summary judgment to HAKS and JMT.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hadley
Clerk of the Appellate Division

26

A-1486-23